# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE RAVENSWOOD INVESTMENT COMPANY, L.P., individually, derivatively and on behalf of a class of similarly situated persons, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | C.A. No. 3730-VCS and C.A. No. 7048-VCS |
| THE ESTATE OF BASSETT S. WINMILL, THOMAS B. WINMILL, and MARK C. WINMILL, | : : : : | |
| Defendants, | : : | |
| and | : : | |
| WINMILL & CO., INCORPORATED, | : : | |
| Nominal Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted:  December 13, 2017
Date Decided:  March 21, 2018
Date Revised:  March 22, 2018

R. Bruce McNew, Esquire and Scott B. Czerwonka, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware, Attorneys for Plaintiff.

David A. Jenkins, Esquire and Kelly A. Green, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

The Ravenswood Investment Company, L.P., a stockholder of nominal defendant, Winmill & Co., Incorporated ("Winmill & Co." or the "Company"), has brought derivative claims on behalf of the Company against the Company's board of directors, comprising Bassett Winmill and his two sons, Thomas and Mark Winmill, alleging they breached their fiduciary duties in two respects. First, they granted overly generous stock options to themselves (as Company officers). Second, they caused the Company both to forgo audits of the Company's financials and to stop disseminating information to the Company's stockholders in retaliation for Plaintiff's assertion of its inspection rights pursuant to 8 *Del. C.* § 220. The claims have been tried and the parties' arguments fully briefed.

One of the pillars of our law with regard to public companies is that they must be run for the benefit of their stockholders. That goal, at times, can be difficult to square with the managers' desire to compensate the company's executives generously for their hard work and commitment to the business. To be sure, it is right and proper to incentivize executives to stay with a company and to work hard for its success. But how much incentive compensation is proper? In many companies, this question can be decided by board members who have no personal interest in the matter and aim to fulfill their fiduciary duties to make informed decisions in the company's best interest. In these instances, the independent directors' disinterested decision generally is entitled to deference under the business

1

judgment rule. But, as is often the case in small, family-run businesses, those making the compensation decisions and those receiving the compensation are one and the same. That dynamic can be problematic. It is made even more so when the self-interested decisions are made without proper documentation (in the form of board minutes or otherwise) and without objective evidence supporting them.

Unfortunately, that is how the events giving rise to this litigation unfolded. The Company's board decided it needed to incentivize its officers and pay compensation closer to that of their investment management industry peers. Accordingly, the board decided to grant stock options to certain officers. In doing so, however, the board members granted stock options to themselves, as each board member also served in an executive capacity and each was granted stock options in that capacity. When deciding the terms of the option awards, the board chose not to hire a compensation consultant, used a comparable companies analysis that was neither well-documented nor well-substantiated, agreed that a portion of the consideration for the options could be paid over time as evidenced by promissory notes, and then forgave those notes long before they were paid in full.

The contemporaneous evidence of the board's "process" with respect to the stock option grants is, in a word, thin. Consequently, the Court was left to view the process through a retrospective lens ground in the after-the-fact testimony of the conflicted fiduciaries who made the decisions. As conflicted fiduciaries, Defendants

2

were obliged to prove that the stock options they granted themselves were entirely fair; that is, their burden was to prove that the grant was the product of a fair process that yielded a fair result. They failed to carry that burden. Consequently, I find that Defendants breached their fiduciary duty of loyalty with respect to the option grants.

But there is another important lesson to be learned from this case. While this court endeavors always to remedy breaches of fiduciary duty, especially breaches of the duty of loyalty, and has broad discretion in fashioning such remedies, it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking. Equity is not a license to make stuff up.

After a decade of litigation, Plaintiff has failed to develop any evidence supporting cancellation, rescission, rescissory damages or some other form of damages as possible remedies for the proven breaches of fiduciary duty. The overwhelming evidence reveals that there is no basis for cancellation. Rescission, likewise, does not work because the Company lacks sufficient funds to repay Defendants what they have already paid for the options—a necessary step if rescission is to perform its function of returning all parties to the *status quo* before the wrongful conduct occurred. For this same reason, rescissory damages are not viable either. And Plaintiff has failed to present any evidence upon which the Court could fashion a damages award in some other form. Specific performance of the promissory notes that were forgiven might be an option, but Plaintiff has not sought

3

specific performance in any of its several pleadings nor has it even attempted to demonstrate that the remedy is appropriate. Indeed, if anything, Plaintiff put Defendants on notice that it was seeking the opposite of specific performance, namely rescission or cancellation. Consequently, all that can be awarded is a declaration that Defendants breached their fiduciary duties and an assessment of nominal damages against each Defendant in the spirit of equity.

As for Plaintiff's claims relating to the Company's record keeping and dissemination practices, those claims fail for lack of proof and because, as presented, they reflect an improper attempt to repackage claims already dismissed by the Court.

This is the Court's post-trial opinion.

## I. BACKGROUND

The Court held a two-day trial during which it received 99 trial exhibits and heard live testimony from five witnesses. The Court heard post-trial argument on December 13, 2017. All facts are drawn from the stipulated facts, admitted allegations in the pleadings, evidence admitted at trial and those matters of which the Court may take judicial notice.[1] The following facts were proven by a preponderance of the evidence unless otherwise indicated.

---

[1] Citations to the Joint Pre-Trial Stipulation and Order are referenced "PTO ¶"; to the joint trial exhibits "JX #"; to the trial transcript "Tr. #" and to the post-trial oral argument transcript "OA Tr. #."

**A. The Parties**

Nominal Defendant, Winmill & Co., is a Delaware holding company that "conducts an investment management operation" through its affiliates (in which it has ownership interests of varying degrees).[2] Winmill & Co.'s affiliates manage the assets of several registered investment companies and mutual funds and receive fees in return for those services.[3] At the time of the transactions in question, Winmill & Co.'s stock was traded "in the over-the-counter market formerly known as Pink Sheets."[4] As of 2005, it had approximately $142 million in assets under management.[5]

---

[2] Tr. 20:18–23 (Thomas Winmill Testimony). Prior to 1999, the Company's name was Bull & Bear Group, Inc. Tr. 251:2–252:7; 254:17–24 (Mark Winmill Testimony). In 1999, the Company sold its discount brokerage subsidiary, Bull & Bear Securities, to the Royal Bank of Canada and changed its name to "Winmill & Company Inc." Tr. 251:23–252:8 (Mark Winmill Testimony).

[3] Tr. 126:8–20; 20:18–23 (Thomas Winmill Testimony). Winmill & Co. has varying ownership interests in the affiliated companies. JX 19 (Winmill & Co. 2005 Annual Report), at 1 (explaining the Company owns 25% of Brexil Corp. and 24% of Tuxis Corp.). The Company's financial health depends on "how well [management] [is] selecting the underlying portfolio securities, how well [it is] marketing [its] track record, and how well [it is] executing on the underlying operating requirements of a mutual fund business." Tr. 126:15–20 (Thomas Winmill Testimony).

[4] Tr. 23:4–5 (Thomas Winmill Testimony).

[5] JX 19 (Winmill & Co. 2005 Annual Report).

Plaintiff, The Ravenswood Investment Company, L.P. is, and at all relevant times was, a holder of Winmill & Co.'s Class A non-voting common stock.[6] It brings these claims derivatively on behalf of the Company.

Defendants are the Estate of Bassett Winmill (the "Estate"), Thomas Winmill and Mark Winmill.[7] Bassett, Thomas and Mark comprised the entirety of the Company's board of directors (the "Board") at all times relevant to the proceedings.[8]

The Estate was substituted as a party for Bassett in May 2015 following Bassett's passing.[9] Bassett was the founder of Winmill & Co.'s predecessor and served as the Company's Chairman.[10] Prior to his passing, he owned shares of the Company's Class A non-voting common stock and all of its 20,000 shares of Class B voting common stock (the only voting stock).[11] Bassett's Class B stock was placed

---

[6] PTO ¶ 1.

[7] PTO ¶ 3. I use first names (from time to time) for clarity; I intend no disrespect.

[8] PTO ¶ 3.

[9] PTO ¶ 4; D.I. 132 (C.A. No. 3730-VCS). Bassett died on May 15, 2012. D.I. 132 (C.A. No. 3730-VCS).

[10] PTO ¶ 4.

[11] PTO ¶¶ 7–8.

into the Winmill Family Trust (the "Trust") upon his passing.[12] Defendants, Thomas and Mark Winmill (Bassett's sons), serve as the trustees for the Trust.[13]

Defendant, Thomas Winmill, served (and still serves) as the Company's President and CEO.[14] He has been the general counsel of Winmill & Co. and a member of the Board since the mid-1990s.[15] Thomas was also employed by several Winmill & Co. affiliates during the relevant time period.[16]

Defendant, Mark Winmill, served (and still serves) as the Company's Executive Vice President.[17] Mark worked at the Company and served on its Board from 1987 to 1999; he returned to the Company in 2004.[18] Like his brother, he also

---

[12] PTO ¶¶ 3, 7.

[13] PTO ¶¶ 3, 7.

[14] Tr. 18:3–6, 16–20.

[15] Tr. 18:10–19:3.

[16] Tr. 223:18–24 (Thomas Winmill Testimony). Specifically, Thomas was employed by Brexil Corp. and Tuxis Corp. *Id.*

[17] PTO ¶¶ 4–6.

[18] Tr. 254:17–255:1 (Mark Winmill Testimony). Mark left the Company in 1999 as part of the Company's discount brokerage sale. Tr. 250:21–251:22 (Mark Winmill Testimony). He rejoined the Company in 2004 when his three-year contract with the Royal Bank of Canada ended. *Id.*

worked for Winmill & Co. affiliates at all relevant times.[19]  Both Thomas and Mark

own Class A common stock.[20]

### B. Compensation of the Company's Officers

Since the early 1990s, Winmill & Co.'s Board has determined the proper

compensation of its officers on an annual basis by reviewing the compensation

structure of companies the Board identifies as the Company's peers.[21]  To receive

relevant information for this process, the Board would cause the Company to acquire

small equity stakes in peer companies.  Thereafter, the Board would review those

companies' public filings and stockholder disclosures so that it could evaluate the

compensation paid to their executives.[22]

The Board considers as comparable those companies "that [are] competing

with [Winmill & Co.] in the investment management business."[23]  The evidence

revealed, and Defendants acknowledge, that the "comparable companies" routinely

identified by the Board are considerably larger than Winmill & Co. when measured

by any relevant metric; *e.g.*, outstanding shares, market capitalization, assets under

---

[19] Tr. 252:23–254:3 (Mark Winmill Testimony).

[20] PTO ¶ 8.

[21] Tr. 89:23–90:6 (Thomas Winmill Testimony).

[22] Tr. 89:2–19 (Thomas Winmill Testimony); 262:14–19 (Mark Winmill Testimony).

[23] Tr. 93:6–10 (Thomas Winmill Testimony).

management, revenues, profitability, etc. Nevertheless, in the Board's view, Winmill & Co. was "competing [with these companies] for the same people and [for the same] edge," making the identified peers proper subjects for comparison.[24]

### 1. Thomas, Mark and Bassett's Salaries

As best I can discern from the often-contradictory trial evidence, the three Defendants received the following compensation from Winmill & Co. during the relevant timeframe:

| Year | Thomas (President and CEO) | Mark (Executive VP) | Bassett (Chairman) |
|---|---|---|---|
| 2005 | $12,250 (for the year)[25] | $5,833.33 (for the year)[26] | $27,666.67 (for the year)[27] |
| 2006 | $8,333.33 (per month)[28] | $1,666 (per month)[29] | ??? |

---

[24] Tr. 94:1–17 (Thomas Winmill Testimony).

[25] JX 59 (Compensation Chart), at WIN-0547.

[26] JX 59 (Compensation Chart), at WIN-0547.

[27] JX 59 (Compensation Chart), at WIN-0547.

[28] JX 18 (Nov. 10, 2005 Written Consent). I note that JX 59 (Compensation Chart) appears to indicate that Thomas actually received an annual salary of $12,583.33 in 2006. This is one of several instances where the Company's records are not clear, contradictory and generally not helpful.

[29] JX 10 (May 23, 2005 Written Consent); JX 31 (Dec. 3, 2007 Written Consent). Here again, pursuant to JX 59 (Compensation Chart), Mark may have actually received an annual salary of $9,950.15 in 2006.

| | | | |
|---|---|---|---|
| **2007** | $10,000 (per month)[30] | ??? | ??? |
| **2008** | $25,000 (per month)[31] | $1,666 (per month)[32] | $15,000 (per month)[33] |
| **2009** | ??? | $6,500 (per month)[34] | ??? |
| **2010** | ??? | $15,000 (per month)[35] | ??? |

As President and CEO, Thomas' duties at Winmill & Co. include oversight of operating areas such as legal and compliance, portfolio management, administrative and personnel.[36] "[I]n terms of an allocation of [his] total time spent," Thomas does not consider his position at Winmill & Co. a full-time position and, in the relevant years, he derived the majority of his income from Company affiliates.[37]

---

[30] JX 22 (Nov. 29, 2006 Written Consent), at WIN-0381.

[31] JX 31 (Dec. 3, 2007 Written Consent), at WIN-0391.

[32] JX 10 (May 23, 2005 Written Consent); JX 31 (Dec. 3, 2007 Written Consent). Mark testified that he received an annual salary of $20,000 in 2008. Tr. 275:9–12 (Mark Winmill Testimony).

[33] JX 31 (Dec. 3, 2007 Written Consent), at WIN-0391.

[34] Tr. 275:9–276:21 (Mark Winmill Testimony).

[35] Tr. 275:9–276:21 (Mark Winmill Testimony).

[36] Tr. 19:11–17 (Thomas Winmill Testimony).

[37] Tr. 223:18–24; Tr. 224:24–225:3 (Thomas Winmill Testimony). *See* JX 59 (Compensation Chart).

Mark's responsibilities as the Company's Executive Vice President include general oversight of investment and operating companies, serving as chief investment strategist of certain funds partially owned and advised by the Company through its affiliates, and conducting financial operations, principally of one of the Company's wholly-owned operating entities.[38] Like his brother, Mark also received a majority of his salary from the Company's affiliates during the years leading up to the stock option grants at issue here.[39]

Finally, Bassett served as the Company's Chairman. The parties did not address his responsibilities in that capacity in any detail and I have found no job description or similar evidence in the trial record.

### 2. The 2005 Performance Equity Plan

Winmill & Co. had adopted a stock option plan in 1995 that was to expire in December 2005.[40] With the expiration of the prior plan approaching, in May 2005, the Board (and the Company's sole voting stockholder, Bassett) adopted the 2005

---

[38] JX 46 (Winmill & Co. 2011 Annual Report), at WFIN-0071; Tr. 276:22–227:8 (Mark Winmill Testimony).

[39] Tr. 277:17–278:3 (Mark Winmill Testimony). *See* JX 59 (Compensation Chart); Tr. 277:9–278:3 (Mark Winmill Testimony) ("About how much of your time were you devoting to Winmill & Company from the years 2008 to 2010? A. It was approximately 25 percent. It's fluctuated since then. It's probably less than that from time to time. Q. So, presumably, in the year that you got paid just over $6,000 from Winmill & Company, you were getting compensated by other entities? A. Yes.").

[40] Tr. 24:17–25:10 (Thomas Winmill Testimony).

Performance Equity Plan (the "PEP") by written consent.[41] The PEP was meant to allow the Company to reward its employees (especially those employees most directly responsible for the Company's success) "for past services by way of current compensation and also to provide an incentive for future exertions on behalf of the corporation."[42]

The PEP authorized "granting of a maximum of 500,000 options"[43] on Winmill & Co.'s then approximately 1.5 million outstanding shares of Class A common stock ("Stock").[44] This 500,000 figure was chosen to ensure that an adequate number of shares would be available for future grants of incentive stock options in compliance with Internal Revenue Service ("IRS") rules.[45]

The price of the options granted under the PEP was to be "determined by the [Board] at the time of the grant and [][was] not [to] be less than 110% of the Fair

---

[41] PTO ¶ 9.

[42] Tr. 97:6–13 (Thomas Winmill Testimony). The Board also saw the PEP as a way to "align the interest of employees with shareholders[']," thus benefiting the shareholders. Tr. 257:11–19 (Mark Winmill Testimony).

[43] PTO ¶ 9.

[44] PTO ¶ 11.

[45] Tr. 85:5–86:2 (Thomas Winmill Testimony); 260:2–13 (Mark Winmill Testimony). Pursuant to federal tax law, only $100,000 in face value (the number of options multiplied by the exercise price) of incentive stock options may vest per year. *See* 26 U.S.C. § 422(d)(1).

12

Market Value on the date of grant."[46]  Nevertheless, in its 2005 Annual Report, the

Company stated that stock options would be granted at "fair value," rather than at

"fair market value."[47]  This disclosure to stockholders was never corrected.  The

Board determined that plan beneficiaries could pay for the Stock "in cash to the

extent of par value of the Common Stock acquired and by delivery of a promissory

note in a form satisfactory to the [Board]."[48]

## C. The Disputed Option Grants

Immediately following the adoption of the PEP, on May 23, 2005, the Board

authorized option awards to Bassett, Thomas and Mark pursuant to the PEP after

comparing their compensation with the compensation paid to executives at Board-

---

[46] JX 79 (PEP) § 5.2(a).  Pursuant to the PEP, the Fair Market Value for shares "traded in the over-the-counter market" was "the last sale price of the Common Stock on such date, as reported by the Pink Sheets LLC . . . or if no sale was reported on that date, then on the last preceding date on which such sale took place."  *Id.* § 1.2(k) (Fair Market Value definition).  Pursuant to federal tax law, incentive options must be priced at no less than fair market value.  26 U.S.C. § 422(b)(4).  When a recipient owns 10% or more of a company's total combined voting power of all classes of stock, the stock option must be priced at a minimum of 110% of the fair market value.  *Id.* § 422(c)(5).  Plaintiff continues to argue that the PEP in fact required an option price of "fair value."  *See* Pl.'s Post-Trial Opening Br. 14–16.  For reasons explained below, I find that the PEP required pricing at "fair market value" despite the faulty disclosure to stockholders.

[47] JX 19 (Winmill & Co. 2005 Annual Report), at 14.  *See also* JX 29 (Winmill & Co. 2006 Annual Report), at 10 (still disclosing the stock options to be priced at "fair value").

[48] JX 79 (PEP) § 5.2(d).  The PEP provides that "the Committee" will set the price, but recognizes that "the Committee" means the Board if no committee is designated.  *Id.* § 1.2(d) (Committee definition).

designated "peer" companies.[49]   The Board resolution authorizing the awards reveals that Bassett, Thomas and Mark each received options to purchase 100,000 shares of Stock at $2.948 per share.[50]   At the time of the grant (May 23), the Stock traded at $2.68 per share.[51]   The options were to expire in five years if not exercised.[52]   The Board set the vesting schedule in accordance with IRS rules limiting incentive stock options to a value of $100,000 a year (for each recipient).[53] Since the Board estimated that the 100,000 options granted to each Defendant had

---

[49] PTO ¶¶ 9, 12.  For example, the Board considered the compensation of officers of BKF Capital Group, Inc. ("BKF").  In the eyes of the Board, BKF was a comparable company although the Board acknowledged that BKF had "significantly larger assets under management and . . . their revenues were larger."  Tr. 130:03–131:18 (Thomas Winmill Testimony).  Based on the fact that BKF officers with similar titles earned significantly higher salaries (around $4.8 million per year), the Board found it appropriate to bring the Company's officer salaries "closer towards the industry averages."  Tr. 129:5–21; 130:22–131:12 (Thomas Winmill Testimony).

[50] PTO ¶ 12; JX 15 (May 23, 2005 Written Consent).  Thomas O'Malley, the Company's CFO, received 5,000 stock options as part of his recruitment in June 2005.  Tr. 282:11–16 (Mark Winmill Testimony).

[51] JX 58 (Stock Price Chart May 23–June 30, 2005).  Plaintiff argues that the price contained in the agreements could not have represented the stock option price as of the close of business because the e-mail with the attached documents was sent to the Board at 2:39 p.m. prior to close of the stock market.  Pl.'s Post-Trial Opening Br. 13 (citing JX 9 (E-Mail Chain)).  It is reasonable to believe, however, that the Company's stock price would not change within a matter of a few hours given that the stock was thinly traded.  In fact, the stock continued to trade at that price until May 26, 2005.  JX 58 (Stock Price Chart May 23–June 30, 2005).

[52] PTO ¶ 12; JX 15 (May 23, 2005 Written Consent).

[53] Tr. 97:19–98:12 (Thomas Winmill Testimony); 261:15–262:6 (Mark Winmill Testimony).

14

an approximate value of $200,000 to $300,000 (per recipient), it set a three-year

vesting schedule, with one third of the options vesting in each of those years.[54]

### D. The Exercise of the Options

On December 12, 2006, Bassett and Thomas exercised their respective options

to purchase 66,666 shares of Stock each.[55]  Mark followed suit on January 5, 2007.[56]

Each Defendant paid $1,532.39 in cash and gave a $195,000 promissory note (the

"Notes") to the Company for the remainder of the exercise price.[57]  The interest rate

for each promissory note was fixed at the federal rate set by the IRS.[58]  After

---

[54] JX 15 (May 23, 2005 Written Consent), at W-0005; Tr. 97:23–98:17 (Thomas Winmill Testimony).  The first 33,333 options vested at the time of the grant.  JX 15 (May 23, 2005 Written Consent), at W-0005.

[55] PTO ¶ 14.

[56] PTO ¶ 15.  At the time of the exercise, the second vesting period had begun and, thus, each Defendant could exercise up to 66,666 options.  JX 15 (May 23, 2005 Written Consent), at W-0005.

[57] PTO ¶ 16; JX 12 (Stock Option Agreement Bassett Winmill) § 8.3; JX 13 (Stock Option Agreement Mark Winmill) § 8.3; JX 14 (Stock Option Agreement Thomas Winmill) § 8.3; Tr. 263:22–264:5 (Mark Winmill Testimony).  The Board resolved, by written consent, that all three Notes were satisfactory.  JX 82 (Dec. 12, 2006 Written Consent); JX 83 (Jan. 5, 2007 Written Consent).  The December 12, 2006 written consent submitted as evidence was not signed by Mark Winmill.  JX 82 (Dec. 12, 2006 Written Consent).  In my view, however, the lack of a signature is not evidence that the Board did not actually accept the Notes as adequate to reflect the amounts due from Bassett, Thomas and Mark.  Mark testified credibly that he recognized the written consent and related documents and that he approved them.  This testimony is sufficient to authenticate the document and to satisfy me that Mark approved the matters set forth in the consent in his capacity as director.  Tr. 268:21–269:7 (Mark Winmill Testimony).  *See* D.R.E 901.

[58] Tr. 245:5–246:6 (Thomas Winmill Testimony); 268:13–16 (Mark Winmill Testimony). The interest rate for Thomas and Bassett's Notes was 4.75% and the interest rate for Mark's

Defendants executed the Notes, they paid interest on those Notes, mainly through payroll deductions.[59] None of the remaining options were exercised prior to their expiration.[60]

### E. The Forgiveness of the Notes

In February 2008, less than three months after approving a Company-wide employee bonus of four weeks' salary,[61] the Board resolved to forgive the Notes as

---

Note was 4.58%. JX 24; JX 26; JX 28. The difference in interest rates corresponds with the difference in IRS interest rates for the specific dates on which the Notes were given. Tr. 301:18–24 (Thomas O'Malley Testimony).

[59] JX 93 (Interest Due on Promissory Notes); Tr. 271:10–19 (Mark Winmill Testimony). Plaintiff continues to argue that JX 93 only shows the interest that is due to the Company and does not show the interest paid. Pl.'s Post-Trial Reply Br. 4. That is not correct. As explained by the Company's CFO, Thomas O'Malley, and as demonstrated by the actual document, the document tracks both: the interest due and, with the designation "p/r deduction," the interest paid by Defendants via payroll deduction. *See* JX 93 (Interest Due on Promissory Notes); Tr. 303:3–16; 340:3–5 (Thomas O'Malley Testimony). The O'Malley testimony to which Plaintiff refers in support of its argument that the document only represents accrued amounts actually addressed aspects of the Company's general ledger. Pl.'s Post-Trial Reply Br. 4; Tr. 315:14–20 (Thomas O'Malley Testimony). O'Malley testified convincingly that the Company documented the received interest payments monthly on the chart designated as JX 93. Tr. 314:9–317:1 (Thomas O'Malley Testimony).

[60] Tr. 103:8–23 (Thomas Winmill Testimony); Tr. 267:1–9 (Mark Winmill Testimony). Defendants maintain that the remaining options were not exercised for tax reasons. Tr. 103:8–104:18 (Thomas Winmill Testimony); 267:5–9 (Mark Winmill Testimony). Plaintiff asserts that Defendants did not exercise the remaining options because of this litigation. Pl.'s Pre-Trial Br. 14. In my view, the reason(s) are immaterial.

[61] JX 31 (Dec. 3, 2007 Written Consent), at WIN-0388. Thomas characterized the Company-wide bonus as a "profit share." Tr. 201:21–24 (Thomas Winmill Testimony).

a special bonus for the Company's exceptionally good performance in 2007.[62] Once again, the Board based its determination to reward management on an *ad hoc* comparable companies analysis.[63] Ultimately, the Company recognized and booked the forgiveness of the Notes in 2008 rather than in 2007 so that the beneficiaries could "avoid the immediate requirement to come up with cash to pay for the tax on the forgiveness income."[64]

---

[62] Tr. 129:5–10; 242:13–23 (Thomas Winmill Testimony); JX 32 (Feb. 29, 2008 Written Consent). Plaintiff takes issue with Defendants' characterization of 2007 as an exceptional year, pointing to the Company's 2007 and 2008 financial results showing that Winmill & Co. "earned a before tax income of $274,013." Pl.'s Post-Trial Opening Br. 21 (citing JX 35 (Winmill & Co. Inc. 2007 and 2008 Audit Report), at WFIN-0005). Defendants argue that 2007 was deemed financially successful because the Company's revenues went from approximately $1.4 million in 2005 to approximately $3.3 million in 2007. Defs.' Post-Trial Answering Br. 47. According to Defendants, the marked increase in revenue must be attributed to the efforts of management because the "primary driver" was "assets under management" which, in turn, depended upon "how well [management is] selecting the underlying portfolio securities, how well [it is] marketing [its] track record, and how well [it is] executing on the underlying operating requirements of a mutual fund business." Tr. 126:5–20 (Thomas Winmill Testimony). After reviewing the evidence, I agree with Defendants that 2007 was a successful year for the Company. I also agree with Plaintiff, however, that there is no evidence in the record to support the contention that the improved performance was attributable to any specific contribution by any of the Defendants. *See* JX 29 (Winmill & Co. 2006 Annual Report), at 5; JX 35 (Winmill & Co. Inc. 2007 and 2008 Audit Report), at WFIN-0005; Tr. 123:18–128:6 (Thomas Winmill Testimony).

[63] Tr. 129:11–21; 132:6–133:4 (Thomas explaining that he saw his position comparable to that of the Senior Portfolio Manager of BKF who earned around $4.8 million in 2006). Again, no compensation consultant was hired in connection with the Note forgiveness and the same process of reviewing "peer" information informed the Board's decision. Tr. 242:5–243:12 (Thomas Winmill Testimony).

[64] Tr. 135:20–24 (Thomas Winmill Testimony).

In April 2008, the Board rescinded the forgiveness of the Notes when it realized that the Company would immediately have to "mak[e] withholding tax deductions from payroll" for each beneficiary.[65]  Soon after, the Board resolved to forgive the entirety of Thomas' Note (who had sufficient funds to "shoulder the additional withholding"), and to forgive Mark's Note in three tranches over three years (to ease the tax burden on Mark).[66]  By the time the Board resolved to forgive the Notes, Thomas had paid approximately $12,000 in interest and Mark approximately $20,000.[67]

Upon his request, the Board decided not to forgive Bassett's Note after it rescinded the initial forgiveness.[68]  In December 2011, Bassett was unable to pay the Note when due.[69]  Accordingly, the Board accepted a new note from Bassett that

---

[65] Tr. 135:24–136:24 (Thomas Winmill Testimony).

[66] Tr. 136:6–137:23 (Thomas Winmill Testimony); JX 84 (Apr. 24, 2008 Written Consent). Mark's Note was forgiven in three increments: $50,000 in 2008, $50,000 in 2009 and the remaining $95,000 in 2010.  JX 84 (Apr. 24, 2008 Written Consent); JX 85 (Feb. 23, 2009 Written Consent); JX 86 (Jan. 12, 2010 Written Consent).  Plaintiff argues that the final forgiveness (in 2010) was not valid because the written consent was not properly signed. Defs.' Post-Trial Opening Br. 24.  I addressed that argument during trial, Tr. 4:16–5:16; 14:11–15:3, and, in any event, since I find in favor of Plaintiff on this claim, I see no need to consider Plaintiff's evidentiary objection further.

[67] Tr. 304:12–305:17 (Thomas O'Malley Testimony).  *See also* JX 93 (Interest Due on Promissory Notes).

[68] Tr. 140:22–141:6 (Thomas Winmill Testimony).

[69] Tr. 142:4–16 (Thomas Winmill Testimony); 325:3–15 (Thomas O'Malley Testimony).

18

extended the maturity by an additional five years.[70] The Estate paid off this note following Bassett's death.[71] By that time, Bassett had already paid around $31,000 in interest. The total interest paid by Bassett (and the Estate) was $49,000.[72]

## F. Plaintiff's Expert

At trial, Plaintiff presented expert testimony from Audrey Croley ("Croley").[73] In her prior work, Croley was employed by or collaborated with companies to develop incentive compensation plans. In her report and trial testimony, Croley addressed the reasonableness of the number of shares authorized under the PEP and the number of shares granted to the plan's beneficiaries in May 2005.[74] With respect to the number of shares authorized, she looked at the

---

[70] Tr. 141:11–142:16 (Thomas Winmill Testimony); JX 39 (Bassett Winmill's 2011 Promissory Note). This new note had an interest rate of 1.27%. JX 39 (Bassett Winmill's 2011 Promissory Note).

[71] Tr. 140:22–141:6; 142:17–146:11 (Thomas Winmill Testimony); 306:14–307:16 (Thomas O'Malley Testimony); JX 87 (Morgan Stanley Account Statement); JX 88 (Letter from Thomas Winmill ordering wire transfer on behalf of the Estate); JX 93 (Interest Due on Promissory Notes).

[72] Tr. 306:14–307:16 (Thomas O'Malley Testimony). *See also* JX 93 (Interest Due on Promissory Notes).

[73] Tr. 352:13–353:9 (Croley Testimony).

[74] JX 55 (Expert Report of Audrey K. Croley ("Croley Report")), at 4. Defendants argue that Croley stated in her deposition testimony that she would opine only on the shares authorized. The confusion over shares authorized versus shares granted was a theme throughout the deposition and at trial. After reviewing Croley's report and deposition, I am satisfied that Defendants were on notice that she would testify at trial regarding the

Company's business cycle and compared the number of shares authorized under the PEP to the number of shares authorized in the plans of the Company's peers. She explained that a company's business cycle is relevant because, in her experience, start-up companies will "set-aside" a higher percentage of shares for incentive plans than companies that have passed beyond their growth period. [75]

According to Croley, Winmill & Co. was long past its growth period given that it was established several decades ago.[76] Since start-up volatility was not an impediment to attracting and keeping talent, Croley concluded that Winmill & Co.'s 33% "set aside" was excessive and unreasonable.[77] In her deposition testimony, Croley opined that 10-15% would have been an appropriate "set-aside" for a company in Winmill & Co.'s position.[78] She based this opinion on her experience,

propriety of both the shares authorized and the shares granted. *See id.*; JX 5 (Croley Deposition) at 27:9–15; 28:19–29:3; 52:11–53:19.

[75] Croley Report 7, 10; JX 5 (Croley Deposition) at 43:12–44:7.

[76] Croley Report 10. Croley stated in her report that the Company was formed in 1971 but then corrected that testimony at trial to confirm that the Company was actually formed in 1974. Tr. 381:23–24 (Croley Testimony). In arriving at her business cycle conclusion, Croley did not consider whether the Company had changed its business throughout its existence or any information relating to its financial condition that might suggest the Company had not reached a "steady state." Tr. 381:4–383:19 (Croley Testimony).

[77] Croley Report 10. According to Croley, the fact that Winmill & Co. had moved past its growth period was demonstrated by its competitive base salaries. *Id.*

[78] JX 5 (Croley Deposition) at 48:14–22.

what "the thinking" is typically at conferences she attends and what she has picked up from "discussions with people."[79]

For her peer analysis, Croley used a list of 28 companies developed by the Board in 2003.[80]  Although she found "the makeup of the [Board's identified] peer companies . . . [to be] inappropriate," she did not independently attempt to determine an appropriate peer group.[81]  She explained that while the Board's chosen companies were comparable in mission and operations, they were not truly comparable because the "size of the vast majority of the organizations [was] significantly larger than Winmill [& Co.]."[82]  She determined that a four-company subset of the identified companies would provide a more appropriate compensation benchmark.[83]  In that subset, she included companies with assets under management of less than $2 billion.[84]  She found no indication among the companies in her chosen subset that

---

[79] JX 5 (Croley Deposition) at 50:17–52:4.  Croley was unable to identify those people. She did not consult any publications or literature.  *Id.* at 50:17–51:10.

[80] Croley Report 7; Tr. 355:12–20 (Croley Testimony).

[81] JX 5 (Croley Deposition) at 44:13–15; 69:5–18.

[82] Croley Report 7.

[83] Croley Report 8.

[84] Croley was unaware what type of assets Winmill & Co. managed.  Nevertheless, she concluded that assets under management generally was the most important metric by which to measure comparability since it was the first metric identified by most investment management companies in their public filings.  JX 5 (Croley Deposition) at 47:23–48:8; 62:20–63:11; 64:9–66:12.  Croley chose the $2 billion benchmark because it was the

21

any "had a stock option plan that set aside as high an equity percentage as Winmill [& Co.]."[85]

As of her report and deposition, Croley had not calculated the percentage of shares set aside for option plans within the companies comprising her chosen subset.[86] By the time of trial, however, she had determined that, among her four company subset, two companies had set aside and granted a greater percentage of stock options than Winmill & Co., thus placing "Winmill & Co[.] in the middle . . . [with] two above and two below."[87]

Turning to the grant of stock options, Croley's opinion was less clear. This partially stemmed from her tendency to use the terms "set-aside," "authorized" and

---

biggest jump in assets under management among the purported peers and "looked like it could be an appropriate break." *Id.* at 68:13–19.

[85] Croley Report 9. Croley also took issue with the fact that the PEP did not link option grants to performance. JX 5 (Croley Deposition) at 86:12–24.

[86] JX 5 (Croley Deposition) at 79:18–80:18.

[87] Tr. 402:3–15 (Croley Testimony) ("Q. . . . As of the deposition, you hadn't looked at the percentage of stock authorized by any of the companies that had less than $2 billion assets under management; correct? A. That's correct. Q. When did you do the work you have just described? A. Between last week and yesterday. Q. Why did you do that work? A. Because during the deposition that was one of the questions that you asked me. I mean, I assumed that was appropriate. I could be incorrect."); Tr. 411:13–22 (Croley Testimony) ("A. The other ones that I looked at that was within that less-than-two-billion, they were less than these two. Q. But we have at least two that were greater than Winmill & Company? A. We have two. We have two of each. Q. Which would put Winmill & Company in the middle; right, two above and two below? A. Yeah. You could look at it that way, yes.").

"granted" interchangeably.[88]  Moreover, it appeared that the focus of her opinion shifted from options "authorized" in her report and deposition to options "granted" at trial.[89]

With regard to the option grant, Croley first identified Thomas, Mark and Bassett's salaries[90] and then compared them and the share option grants to the plans approved by the Company's peers.[91]  Finding Defendants' salaries competitive, she concluded that the option grants were unreasonable and excessive.[92]  She opined that the "300,000 options [granted pursuant to the PEP] would be fine" had they been spread across all of the key employees of the Company.[93]  Confining the grants to only Bassett, Thomas and Mark, however, could not be justified.[94]

---

[88] *See, e.g.*, Tr. 385:12–387:19 (Croley Testimony); JX 5 (Croley Deposition) at 91:5–13.

[89] *See, e.g.*, Tr. 360:15–364:3 (Croley Testimony); JX 5 (Croley Deposition) at 91:5–13.

[90] Croley determined that for 2005, in addition to the stock options, Bassett received $338,333 in base pay and $26,026 in bonuses, Thomas received $400,000 in base pay and $30,769 in bonuses and Mark received $20,000 in base pay and $1,538 in bonuses.  Croley Report 6.  These calculations included salaries received from Winmill & Co. affiliates. *See* JX 59 (Compensation Chart).

[91] Tr. 354:18–355:20; 359:16–360:8 (Croley Testimony).

[92] Croley Report 10.  Croley also criticized the Board for not employing an independent compensation committee to determine proper compensation.  *Id.*

[93] Tr. 364:5–13 (Croley Testimony).  Croley did not know how many employees or key employees Winmill & Co. had in 2005.  Tr. 393:12–394:16 (Croley Testimony).

[94] Tr. 364:5–13; 369:20–371:15 (Croley Testimony).

## G. Winmill & Co.'s Financial Reporting

Prior to 2004, the Company was listed on the NASDAQ Stock Exchange and, thus, was obligated to prepare audited financial statements and send regular financial information to its stockholders.[95]  In the fall of 2012, the Company ceased preparing audited financial statements.[96]  According to Thomas, his father had wished to continue the auditing process after 2004 even though audited financials were no longer required.[97]  When Bassett passed in 2012, Thomas and Mark, for cost reasons, decided not to engage in further audits after completing the 2011 audit that was already in progress.[98]  The Company stopped distributing its financial information to stockholders in February 2010.[99]  Here again, the decision was driven by costs, a desire for more efficient allocation of resources and a determination that there was no business purpose to be served by regular dissemination of unaudited financials to stockholders when measured against the risk of litigation.[100]

---

[95] Tr. 155:12–22 (Thomas Winmill Testimony).  The Company delisted from NASDAQ in August 2004.  JX 8 (letter to stockholders).

[96] Tr. 155:23–156:5; 225:10–16 (Thomas Winmill Testimony); PTO ¶ 21.

[97] Tr. 156:6–15 (Thomas Winmill Testimony).

[98] Tr. 156:16–157:13 (Thomas Winmill Testimony).

[99] PTO ¶ 21.

[100] Tr. 154:10–155:11 (Thomas Winmill Testimony); JX 4 (Mark Winmill Deposition) at 45:10–46:10; 48:7–20.  O'Malley explained that the Company paid approximately $20,000 for the audit in 2011 even though the Company did not have reporting responsibilities to regulators or creditors that would require or justify audited financial statements.

**H. Procedural History**

This litigation has a long, complex history. I reluctantly recite this history at some length in order to explain how Plaintiff's wide-ranging complaints were funneled down to only two discrete claims for trial. Plaintiff's claims were first stated in two separate actions: (1) a fiduciary duty action filed on April 30, 2008 (the "2008 Action"), and (2) a Section 220 action, including a fiduciary duty claim, filed on November 17, 2011 (the "Section 220 Action"). The 2008 Action and the fiduciary duty component of the Section 220 Action were consolidated for purposes of discovery and motion practice and were tried sequentially.[101]

Plaintiff's complaint in the 2008 Action set forth two counts (one derivative and one direct), both of which alleged that Defendants breached their fiduciary duties by adopting a stock buyback plan, adopting the PEP, issuing the stock options (the "Issuance Claim"), and voting the Company's stock in favor of a transaction involving the sale of Winmill & Co.'s affilitate's interest in a third entity (the "Brexil

---

Tr. 312:24–313:17 (Thomas O'Malley Testimony). Plaintiff quotes testimony of both Thomas and Mark as acknowledging that the decision to discontinue the audit process was made in hopes of avoiding litigation. The testimony cited, however, concerned the decision not to send financial disclosures to stockholders for fear of litigation based on claims of inadequate or misleading disclosures. *See, e.g.*, JX 2 (Thomas Winmill Deposition) at 63:12–66:6; JX 4 (Mark Winmill Deposition) at 48:7–51:21.

[101] *See* JX 52 (*Ravenswood Inv. Co., L.P. v. Winmill & Co., Inc.*, C.A. No. 3730-VCS (Del. Ch. May 12, 2016) (TRANSCRIPT)), at 116 (consolidating the cases for discovery); *see also* Defs.' Opening Br. in Supp. of their Mot. for Summ. J. 1 ("These two cases were consolidated for discovery and tried sequentially").

Claim").[102] On July 9, 2010, Defendants filed a motion to dismiss all claims, except the Issuance Claim.[103] The Court granted the motion in part, denying it only with regard to the Brexil Claim.[104] Thus, after resolution of the motion to dismiss, only the Issuance Claim and the Brexil Claim remained in the 2008 Action.[105] Plaintiff thereafter filed a motion for partial summary judgment (pertaining to the Issuance Claim only), in which it argued that the stock options were invalid because the PEP was not adopted in compliance with Delaware law.[106] That motion was denied.[107]

Plaintiff's complaint in the Section 220 Action set forth two counts.[108] Count I, against the Company, asked the Court to order the Company to produce certain documents. Count II, against the Company and Defendants, alleged that

---

[102] *Ravenswood Inv. Co., L.P. v. Winmill & Co., Inc.*, 2011 WL 2176478, at *1 (Del. Ch. May 31, 2011) (hereinafter *Ravenswood I*).

[103] D.I. 24 (C.A. No. 3730-VCS).

[104] *Ravenswood I*, 2011 WL 2176478, at *1, *7.

[105] Plaintiff brought motions to alter or amend the May 31 Order, which the Court denied on November 30, 2011. *Ravenswood I*, 2011 WL 2176478, at *4.

[106] D.I. 74 (C.A. No. 3730-VCS). The motion challenged the written consent adopting the PEP and granting the stock options as well as the PEP itself based on technical deficiencies, arguing that those deficiencies caused the PEP to be invalid from inception. *Id.*

[107] *Ravenswood Inv. Co., L.P. v. Winmill*, 2013 WL 6228805, at *3 (Del. Ch. Nov. 27, 2013) (hereinafter *Ravenswood II*).

[108] This was the second books and records action brought by Plaintiff. The first was commenced in 2008. *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, C.A. No. 3724-VCN. Plaintiff voluntarily dismissed that action on November 16, 2011. D.I. 10 (C.A. No. 3724-VCN).

Defendants breached their fiduciary duties in connection with their "refusal to have [the Company] provide [its] shareholders reasonable and regular financial information," and asked the Court to order the Company to (1) provide all shareholders with its financial statements for the prior two years and (2) continue to provide "prompt regular disclosure [to shareholders] of financial information about the Company."[109] Defendants filed a motion to dismiss Count II, arguing that a breach of fiduciary duty claim is not properly presented in a Section 220 action and that the claim fails in any event because Delaware does not impose free-standing reporting or disclosure obligations on a corporation's board of directors.[110] The Court heard the motion on October 11, 2012 and determined to (1) separate the fiduciary duty claim from the Section 220 claim and (2) defer resolution of the fiduciary duty claim until after resolution of the Section 220 claim.[111] The

---

[109] Verified Compl. Under 8 *Del. C.* § 220 and for Breach of Fiduciary Duty 6–7; PTO ¶¶ 19–20. Plaintiff sent its inspection demand to the Company on September 11, 2011. PTO ¶ 19.

[110] D.I. 28 (C.A. No. 7048-VCS). Defendants had filed a prior motion to dismiss in response to which Plaintiff amended its complaint. D.I. 12 (C.A. No. 7048-VCS); D.I. 20 (C.A. No. 7048-VCS).

[111] D.I. 58 (C.A. No. 7048-VCS); *Ravenswood II*, 2013 WL 396178, at *1–2.

Section 220 claim was resolved on May 30, 2014, with an order requiring the Company to produce certain records to Plaintiff.[112]

Thereafter, on December 15, 2015, the Court heard oral argument on Defendants' motion to dismiss the fiduciary duty claim.[113] In the Court's bench ruling on that motion, the Court explained that "the failure to provide financial reporting, by itself, does not state a claim."[114] The Court also found, however, that a fiduciary duty breach might occur where a board "decides not to prepare financial reporting, . . . which it has provided in the past, . . . because of a troublesome shareholder's use of its Section 220 rights."[115] Thus, "the fiduciary duty claims asserted by [Plaintiff] [did] not survive in as broad a fashion as they ha[d] been brought, but an aspect [did] survive. That involves the timing or potential motivation

---

[112] *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 2445776 (Del. Ch. May 30, 2014).

[113] D.I. 120 (C.A. No. 7048-VCS). Plaintiff presented its motion to amend at the same time Defendants presented their motion to dismiss. *Id.*

[114] JX 51 (*Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, C.A. No. 7048-VCN (Del. Ch. Feb. 25, 2016) (TRANSCRIPT) (hereinafter *Ravenswood III*)), at 7.

[115] *Id.* at 9. The Court explained that the fiduciary duty claim could not be dismissed because "[t]he directors are family members and controlling shareholders [and there] are allegations of decisions by those directors to benefit themselves at the expense of the minority shareholders. The argument is whether the decision not to prepare the financial reports, or the audited reports, was an effort to save money for the company. And that might well be justified under the business judgment rule. But that can also be contrasted with the decision not to prepare such records in an effort to keep the shareholders in the dark." *Id.*

for stopping the preparation of [] audited financial reports and perhaps other financial information" (the "Financial Reporting Claim").[116]

On February 2, 2016, Plaintiff filed a motion to amend its complaint in the 2008 Action.[117] The Court partially granted that motion[118] and, as noted, consolidated the 2008 Action and the Financial Reporting Claim from the Section 220 Action for purposes of discovery and motion practice.[119]

On February 3, 2017, Defendants filed a motion for summary judgment challenging the remaining claims—the Issuance Claim, the Brexil Claim and the Financial Reporting Claim.[120] The Court granted that motion with respect to the

---

[116] *Id.* at 10.

[117] Plaintiff had filed a prior motion to amend on June 13, 2012, which was never briefed or argued. *See* D.I. 51 (C.A. No. 3730-VCS); Pl.'s Opening Br. in Supp. of its Mot. for Leave to Supplement and Amend 2, D.I. 138 (C.A. No. 3730-VCS).

[118] JX 52 (*Ravenswood Inv. Co., L.P.v. Estate of Bassett N. Winmill*, C.A. No. 3730-VCS (Del. Ch. May 12, 2016) (TRANSCRIPT)), at 111–114. The Court refused to allow the addition of previously resolved claims and the addition of a claim questioning date discrepancies of certain written consents. *Id.* The Court also heard (and denied) Plaintiff's motion to compel and Defendants' motion to quash. *Id.* at 115. Plaintiff thereafter filed a motion to amend that judgment or for reargument. D.I. 178 (C.A. No. 3730-VCS). The Court denied that motion. JX 52 (*Ravenswood*, C.A. No. 3730-VCS (Del. Ch. May 12, 2016) (TRANSCRIPT)).

[119] JX 52 (*Ravenswood*, C.A. No. 3730-VCS (Del. Ch. May 12, 2016) (TRANSCRIPT)), at 116. Plaintiff filed its Amended Verified Class and Derivative Complaint (the "Complaint") in the 2008 Action on August 4, 2016 and Defendants answered on August 25, 2016. D.I. 198 (C.A. No. 3730-VCS); D.I. 204 (C.A. No. 3730-VCS).

[120] D.I. 212 (C.A. No. 3730-VCS; C.A. No. 7048-VCS).

Brexil Claim, but denied it with respect to the Issuance Claim and the Financial Reporting Claim.[121] The parties tried these latter two claims in mid-May.[122]

## II. ANALYSIS

As explained, following the Court's various rulings in the two actions, two claims remained for trial: (1) whether Defendants breached their fiduciary duties by authorizing and granting stock options to themselves (the Issuance Claim)[123]; and (2) whether the Board's decision to cease preparing audited financial statements and distributing financial information to stockholders was an improper decision in retaliation against Plaintiff for its Section 220 Action (the Financial Reporting Claim). I address each claim in turn.

### A. The Issuance Claim

Plaintiff maintains that entire fairness review applies to the Issuance Claim because Defendants' grant of stock options to themselves is a clear instance of self-dealing. Applying that standard, Plaintiff contends that Defendants have failed to

---

[121] JX 57 (*Ravenswood Inv. Co., L.P. v. Winmill*, C.A. No. 3730-VCS, C.A. No. 7048-VCS (Del. Ch. Apr. 27, 2017) (TRANSCRIPT) ("Summary Judgment Bench Ruling")).

[122] *Id.*

[123] The parties are in agreement that the 2008 Action raises claims that are derivative, such that the direct claim(s) in Count I of the 2008 Action can be dismissed. *See* Defs.' Post-Trial Answering Br. 1 n.1; Pl.'s Post-Trial Opening Br. 60 ("Defendants are liable to Winmill & Co. . . . "). Thus, the defined term "Issuance Claim" refers only to the derivative claim (Count II of the 2008 Action).

30

prove that the process of authorizing and granting the options was entirely fair because (1) they have not proven the actual terms, much less the proper adoption or implementation, of the PEP; (2) the number of options authorized under the PEP was not fair; and (3) the number of options granted was not fair. Plaintiff further argues that the price paid for the options was not fair because the price selection was improper and Defendants paid for the options, in part, with notes they later inexplicably determined, as a Board, should be forgiven.

Defendants counter that the business judgment rule should apply to the Issuance Claim because Plaintiff "has not put forth sufficient evidence to subject this to entire fairness."[124] Even if entire fairness does apply, however, Defendants assert that the number of options authorized is irrelevant, that Defendants' process was fair and that the number of options granted, according even to Plaintiff's expert, was fair when compared to grants under similar plans adopted by the Company's peers. The grants were at a fair price, according to Defendants, because they were set at 110% of the fair market value in accordance with IRS rules, Defendants had no reason to believe the Notes would be forgiven at the time the grants were made and, in any event, the forgiveness of the Notes was fair when considered in the context of Defendants' overall compensation package.

---

[124] OA Tr. 48:21–49:3. *See* Defs.' Post-Trial Answering Br. 26–28.

I agree with Plaintiff that entire fairness review applies and that Defendants have failed to meet their burden under that standard of review. Accordingly, I find that Defendants breached their fiduciary duty of loyalty to the Company. How to remedy that breach, however, presents a more perplexing question.

### 1. Entire Fairness Is the Standard of Review

"Directors who stand on both sides of a transaction have the burden of establishing its entire fairness." [125] Here, there is no question that, in 2005, Winmill & Co.'s directors were Bassett, Thomas and Mark Winmill and that they also were the three officers receiving option grants under the PEP. Under these circumstances, the business judgment presumption must give way to entire fairness review.[126]

Entire fairness requires a showing that the directors acted with "utmost good faith and the most scrupulous inherent fairness of the bargain."[127] To demonstrate

---

[125] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007). Defendants correctly argue that, in order to trigger entire fairness review, Plaintiff was obliged to offer evidence at trial to rebut the business judgment rule presumption. Defs.' Post-Trial Answering Br. 26–27. *See Solomon v. Armstrong*, 747 A.2d 1089, 1111–12 (Del. Ch. 1999). By proving that Defendants stood on both sides of the transaction at issue, Plaintiff met its threshold burden. *Valeant*, 921 A.2d at 745.

[126] *See Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 578 (Del. Ch. 2015).

[127] *Valeant*, 921 A.2d at 746.

entire fairness, Defendants were required to prove both fair dealing and fair price.[128] The fair dealing analysis concentrates on "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors and how approvals of the directors and the shareholders were obtained."[129] In the fair price analysis, the court looks at the economic and financial considerations of the transaction to determine if it was substantively fair.[130] I will take up the elements of entire fairness in turn, but first must address Plaintiff's argument that Defendants have failed to present competent evidence to prove the terms of the PEP.

### a. The Terms of the PEP were Adequately Proven

Plaintiff contends that Defendants have been unable adequately to demonstrate the PEP's terms and that this evidentiary gap somehow precludes a finding that Defendants have met their burden of proof on the Issuance Claim.[131]

---

[128] *Id.  See also In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *5 (Del. Ch. Feb. 15, 2010) (explaining that defendants "bear the burden of demonstrating" entire fairness because they "did not use any of the procedural devices that could temper the application of the entire fairness standard").

[129] *Valeant*, 921 A.2d at 746 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

[130] *Id.*

[131] Pl.'s Post-Trial Opening Br. 36, 43.  I confess that Plaintiff's dogged pressing of this argument is perplexing to me.  Specifically, it is not clear what Plaintiff would have me do with respect to its breach of fiduciary duty claim in the event I determine that the terms of the PEP have not been established in the evidence.  With no terms to review, it is not clear how Plaintiff would have me determine that the PEP was not properly conceived or

33

I disagreed at trial and disagree now.[132] The PEP offered as an exhibit at trial demonstrates its terms and the consents approving the PEP demonstrate that the Board, in fact, approved the plan.

### b. Fair Process

The PEP authorized the issuance of 500,000 stock options. While it is, at best, unclear whether Plaintiff ever fairly raised a complaint regarding the number of shares authorized in the PEP, [133] at this point, with the authorizing provisions of the

---

implemented. I need not ponder this dilemma further, however, as I find the terms of the PEP to be as Defendants presented them.

[132] Plaintiff's argument that Defendants have failed adequately to demonstrate the terms of the PEP boils down to an authenticity objection. On this point, the Court engaged in a rather lengthy exchange with Plaintiff's counsel during trial at the end of which I found the proffered foundation sufficient to authenticate both the PEP and the consents approving the PEP. Tr. 83:6–84:9. I do not find anything in the post-trial arguments or the evidentiary record that raises a legitimate question regarding the authenticity or credibility of the documents and thus refer back to my ruling at trial with respect to this issue. *Id.*

[133] *See, e.g.*, Compl. ¶¶ 65–74 (Counts I and II challenging "the issuance of stock options and the exercise thereof"); Pl.'s Answering Br. in Opp'n to the Individual Defs.' Mot. for Summ. J. 25 ("The Amended Complaint therefore properly pleads a claim regarding both the number of options and the price paid for the options."); Pl.'s Pre-Trial Br. 35 ("Even assuming that Defendants could satisfy their threshold evidentiary burden, however, they still cannot satisfy their primary burden that the amount of options granted was entirely fair."); Defs.' Pre-Trial Opening Br. 25 n.17, 26 (explaining that the number of options authorized is irrelevant and that the court should concentrate on the options exercised); Pl.'s Answering Br. in Opp'n to the Individual Defs.' Mot. for Summ. J. 25 (referencing the shares authorized only to support their unfair grant argument); Compl. ¶¶ 65–74 (Counts I and II) (alleging breaches of fiduciary duty "in connection with the issuance of stock options and the exercise thereof" not mentioning the number of shares authorized); OA Tr. 29:3–4 (Plaintiff's counsel explaining that it appears Defendants chose to authorize 500,000 options under the PEP in order to accommodate their already-made decision to grant themselves 300,000 options).

PEP long expired, it is no longer relevant how many shares were authorized.[134] The focus now must be on the options granted when the incentive stock option provisions of the PEP were in force.

As mentioned, the same day the Company adopted the PEP (and authorized the 500,000 stock options), the Board granted Defendants 100,000 stock options each. Thomas testified that the option grants were awarded to "reward for past services by way of current compensation and also to provide an incentive for future exertions on behalf of the corporation,"[135] and that the number of options was determined in accordance with the Company's usual compensation practices.[136]

There are several indications that the Board's process in deciding to grant options and then determining the terms of those grants was not fair. At the outset, I note that the term "process" does not really fit here; the evidence reveals that there really was no process. There are no Board minutes or any other contemporaneous records reflecting specifically why the Board decided that a grant of options was appropriate or how the Board determined the number of options to be granted. There

---

[134] JX 79 (PEP) § 12.2 (stating that incentive options can only be granted pursuant to the PEP for ten years from May 23, 2005).

[135] Tr. 97:3–13 (Thomas Winmill Testimony). The Board chose to award stock options instead of compensation increases to preserve the Company's cash resources. Tr. 26:15–27:20 (Thomas Winmill Testimony).

[136] Tr. 98:2–17 (Thomas Winmill Testimony).

is no indication that the Board sought out the advice of outside legal, financial or compensation consultants.[137] Nor is there evidence that the Board consulted any literature or other authoritative sources with regard to incentive compensation. Indeed, Defendants were hard-pressed to recall any of the specifics of their deliberative process more than ten years ago and, instead, were forced to rely upon their likely compliance with usual practices with respect to compensation issues.[138]

Beyond the troubling lack of any contemporaneous evidence of process, the sole analytical tool on which Defendants "usually" relied (and, therefore, presumably relied in this instance) is severely flawed. Defendants testified that the Board used its customary comparable companies analysis when it determined to authorize and grant the stock options (and when it decided to forgive the Notes in 2008).[139] With respect to that analysis, Defendants were unable to produce the 2005

---

[137] Tr. 176:14–18 (Thomas Winmill Testimony).

[138] *See, e.g.*, Tr. 29:14–20; 39:4–14 (Thomas explaining his customary practice with regard to handling his consents, acknowledging that he could not testify from memory); Tr. 89:2–90:20 (Thomas explaining the general compensation practices of the Board); Tr. 186:19–187:20 (Thomas explaining that he could not recollect the 2005 comparable companies); 188:18–189:1 (Thomas stating he "think[s] there might have been one or two" comparable companies in 2005 that had at least as many shares authorized, explaining that "BKF might be one"); 223:18–24 (Thomas unable to remember which companies he received salaries from in 2005); 286:6–14 (Mark unable to remember if he ever received certain documents, assuming he must have received them at some point since he signed them).

[139] To characterize the Board's process as a "comparable companies" analysis is, at best, charitable. As noted, the Board caused the Company to buy stock in companies it deemed, on an *ad hoc* basis, to be peer companies. The Board members then reviewed those companies' public filings and stockholder disclosures to learn what they could about the

36

comparable companies list they used and could not otherwise confirm the companies they considered in 2005 with any certainty.[140]  The only list they were able to offer (a 2003 list) compiled a group of companies that did not resemble Winmill & Co. beyond the fact that they also engaged in investment management activities.[141]  Yet Defendants presented no evidence (contemporaneous or otherwise) that they fully appreciated, much less accounted for, this significant disconnect when making decisions regarding the implementation of the PEP.[142]

---

companies' compensation practices.  Tr. 89:2–90:20 (Thomas Winmill Testimony). Defendants presented no evidence to support the notion that this is a proper framework by which to conduct a reliable comparable companies analysis and I very much doubt that an expert in such analyses would endorse this approach.

[140] *See, e.g.*, Tr. 281:10–17 (Mark Winmill Testimony).  The only list produced was one from 2003.  JX 6 (2003 Comparable Companies List); Tr. 185:22–188:3.  Thus, it is impossible to determine from the record whether the companies considered in 2005 were, in fact, comparable.

[141] Tr. 93:22–94:17; 220:12–221:15 (Thomas Winmill Testimony); 355:1–12 (Croley Testimony).

[142] *See, e.g.*, Tr. 93:22–94:17 (Thomas explaining that the companies "vary in size considerably" from Winmill & Co. but that "in the big picture" they all compete for the same employees and, thus, that the Company had to "pay competitive salaries").  Thomas did testify that the Board "had to take [the size difference] into account in trying to determine cash compensation . . . and equity compensation," but offered no explanation of exactly *how* the Board took that information into account.  Tr. 220:12–221:15 (Thomas Winmill Testimony).  He also explained that he did not ask for the same compensation as his "equivalent" at a "peer" company ($4.8 million) because "[t]he [C]ompany doesn't have 4.8 million."  Tr. 133:11–14 (Thomas Winmill Testimony).  This again indicates that the comparable companies approach undertaken by the Board was misguided.

While it may be true, as Defendants maintain, that companies of comparable size did not exist, that would be all the more reason to enlist independent, expert guidance in determining proper compensation, or at least to consult appropriate industry materials when making compensation decisions, particularly given the conflicted status of the decision makers.[143] The fact that each Defendant received the exact same number of options despite differences in job responsibilities and income (without explanation) further supports a conclusion of an unfair process.[144]

Moreover, the reason offered by Defendants for their choice of peer companies is simply not credible. Specifically, I cannot believe that the Board actually viewed the selected peer companies as comparable because they were "competing for the same people."[145] Given that the designated peer companies were

---

[143] *See, e.g.*, *Valeant*, 921 A.2d at 747–48 ("The committee did not examine afresh the question of whether any bonus arrangement was appropriate and, if so, how much and what form of bonus to award."). Defendants explained that they did not find it necessary to hire a compensation consultant. According to Defendants, the cost was not justified and the Board had made compensation determinations as part of its regular course of business for years. Tr. 240:18–243:12 (Thomas Winmill Testimony). Regardless of the Board's past practices, avoiding the cost of a consultant is not a proper justification for a process that is unfair to the Company and its stockholders and that may result in excessive compensation.

[144] The February 28, 2008 written consent does state that the Board considered the "total compensation packages, and employee responsibilities and performance, relative to employees with comparable responsibilities at similar companies." No evidence was presented to enlighten the Court as to exactly what the Board considered as justification for the awards apart from the vague reference to "performance . . . in 2007." JX 32 (Feb. 28, 2008 Written Consent); Tr. 203:4–204:20 (Thomas Winmill Testimony).

[145] Tr. 94:9–17 (Thomas Winmill Testimony); 276:22–277:16 (Mark Winmill Testimony).

so much larger in size than Winmill & Co. (when measured by any relevant metric), the Board could not reasonably have believed that it was competing (or could have competed) with these companies to recruit the same people to fill senior management positions.[146] It also is not credible that any of the Defendants actually considered leaving their family company because they were not receiving adequate compensation.[147] As of 2005, all Defendants had been with the Company for years

---

[146] Defendants' counsel acknowledged as much, explaining that it "is not a perfect analogy but it's the best you can do." OA Tr. 67:7–8.

[147] Defendants' compensation from the Company was not *per se* excessive. Nevertheless, there is evidence in the record indicating that Defendants did receive significant fees from Winmill & Co.'s affiliates while working for the Company. *See* JX 59 (Compensation Chart); Tr. 278:10–279:7 (Mark Winmill Testimony). Their compensation by Company affiliates was a point of much contention at post-trial oral argument, during which Plaintiff urged the Court to conclude that Defendants were overcompensated, taking into account compensation they received from Winmill & Co. affiliates. OA Tr. 6:11–7:2; 11:22–15:8. Defendants were quick to respond that Plaintiff did not bring an "excessive compensation case" and that Plaintiff's post-trial arguments amounted to unfair sandbagging. OA Tr. 72:11–75:9. I agree that Plaintiff did not plead or present an "excessive compensation case" and I do not entertain that claim here. *See* Compl. ¶¶ 21, 65–79 (none of the allegations suggest that Defendants, in the aggregate, received compensation that was excessive); Pl.'s Answering Br. in Opp'n to the Individual Defs.' Mot. for Summ. J. 1 (only reference to compensation refers to Defendants having the burden of proof on the Issuance Claim because "the challenged options involve self-interested compensations decisions"); *see also Ravenswood I*, 2011 WL 2176478, at *3 n.31 ("Ravenswood has not advanced this claim either in its brief or at oral argument, and the Complaint alleges no facts suggesting that the Company, as contrasted with Midas or Bexil, paid compensation to the Defendants. To the extent that Ravenswood maintains a claim that the Defendants received improper compensation from the Company, that claim is dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim."). While I have not considered an excessive compensation claim, given Defendants' proffered explanation for the option awards, I do find that evidence of the Defendants' compensation from Winmill & Co. affiliates is relevant to whether they would actually leave the Company to compete in the market and, if they were to leave, what the market for their services would be.

39

and were personally invested in the Company's success.[148] Bassett, in fact, established the Company in the 1970s, attached his family name to the business in the late 1990s, and brought on his sons, Thomas and Mark, to work for the Company very early in their professional careers.[149] And each of Bassett, Thomas and Mark received significant compensation from the Company's affiliates, making their departure even less likely.[150]

Even if the Board that made these executive compensation decisions had been disinterested, the lack of process would be problematic. But this Board was not disinterested; each of its members was a beneficiary (indeed they were the only beneficiaries) of the option grants in May 2005. The need to employ conflict neutralizing measures was omnipresent here and yet the Board did nothing meaningful to ensure that the decisions it made were fair to Winmill & Co.

---

[148] Tr. 277:9–17 (Mark Winmill Testimony) ("Q. Why were you willing to work for Winmill for that level of cash compensation? A. Well, I was perfectly aware that Winmill, or any company, couldn't possibly retain the services of someone with my education, work experience, et cetera, but I was very interested in Winmill & Company's success. It was a part-time part of my employment and I was very interested in the stock.").

[149] In this regard, I did not find Thomas' testimony, that he considered leaving the Company "[f]rom time to time," particularly convincing. Tr. 161:16–162:4 (Thomas Winmill Testimony).

[150] *See, e.g.*, JX 59 (Compensation Chart); Tr. 223:18–24 (Thomas testifying to receiving compensation from Brexil Co. and Tuxis Co. in 2005); Tr. 278:10–279:14 (Mark explaining that he spends 75% of his time working for affiliate Tuxis Co. for which he was compensated).

In a final attempt to justify the option grants, Defendants point to Plaintiff's expert, Croley, and characterize her testimony as proof that the option grants were fair.[151] According to Defendants, Croley conceded that two companies within her chosen peer subset authorized and granted more shares under their plans than Winmill & Co. authorized and granted under the PEP.[152] Setting aside the fact that I did not find Croley's testimony to be helpful on any issue, I note that Croley did not offer any specific opinions regarding the processes by which the Board made decisions with respect to the PEP. Rather, her opinions focused on the outcomes of those decision-making "processes," such as they were.[153] Simply stated, Croley's testimony was no more helpful to Defendants than it was to Plaintiff.

---

[151] Defs.' Post-Trial Answering Br. 37–39, 41–43. Defendants otherwise vigorously attack Croley's testimony and credentials. *See id.* at 37 ("Prior to her involvement in this case, she had never determined an appropriate peer group for an asset management company, and she had no experience in that industry. [] Indeed, when she drafted her report and at her deposition, Ms. Croley did not understand what type of assets Winmill & Co. was managing. [] She does not consider herself an expert on what companies are correct peers of Winmill & Co., nor whether the companies on Winmill & Co.'s 'list' were proper peers."); *id.* at 42 ("Croley also acknowledged that a purpose of a stock option plan is to reward key employees of a business. [] She did not know, however, how many 'key employees' Winmill & Co. had in 2005. [] Indeed Croley did not know the number of total employees in 2005, but was 'thinking it was like a hundred or something.' []; in reality, it was approximately 12."). As the absence of any reference to Croley's opinions in my analysis of fair process suggests, I did not find her testimony particularly useful. The lack of precision, foundation and consistency undermined the credibility of her opinions at every stage of the litigation in which she was involved (from report, to deposition, to trial).

[152] *Id.* at 39, 42.

[153] *See, e.g.*, Croley Report 10 (addressing option grants but making no reference to process); JX 5 (Croley Deposition) at 91:5–13 (stating she would not opine on the shares granted); Tr. 360:19–364:13 (Croley addressing option grants but making no reference to

41

The Board's decisions to grant options, to fix the number of options granted, and to fix the terms of those options were arbitrary and not justified as providing any commensurate benefit to the Company or its stockholders. Consequently, Defendants failed to prove fair process.[154] Given this finding, I arguably could end the analysis here.[155] For the sake of completeness, however, I address Defendants' arguments and evidence regarding the fairness of the price below.

### c. Fair Price

Plaintiff argues that the price set for the options was unfair and that the price paid (according to Plaintiff: nothing) was also unfair. Defendants counter that the price paid for the options was fair because (1) the Court has already determined that

---

process); Tr. 369:13–371:23 (Croley acknowledging that her report was not clear regarding her opinion with respect to option grants); Tr. 386:3–387:1 (Croley addressing option grants but making no reference to process); Tr. 411:2–22 (same).

[153] Tr. 386:3–387:1 (Croley Testimony).

[154] *Valeant*, 921 A.2d at 748 ("It simply cannot be said that an independent board advised by independent experts would have employed a similar process in negotiating or approving bonuses of this kind.").

[155] *See Oliver v. Boston Univ.*, 2006 WL 1064169, at *25 (Del. Ch. Apr. 14, 2006) (finding a breach of duty upon concluding that defendant did not prove fair process despite the court's finding that the price was fair); *Weinberger v. UOP, Inc.*, 1984 WL 478433, at *6 (Del. Ch. Apr. 24, 1984) ("Since the test of entire fairness is comprised of two elements, fair dealing and fair price, the defendants have already flunked the test since they have not passed the fair dealing requirement."). *Cf. Valeant*, 921 A.2d at 748 (noting that fair price might render transaction entirely fair notwithstanding unfair process, but observing that proving as much would be "exceptionally difficult") (citing *Oliver*, 2006 WL 1064169, at *25).

the price set by the Board in devising the PEP was fair; (2) the price paid was based on the compensation Defendants received in comparison to market compensation; and (3) Defendants took seriously their obligations under the Notes and paid interest thereon until the Board determined that the Notes should be forgiven (a decision justified by the Company's exceptional performance in 2007).

I agree with Defendants that the Court previously determined the price set for the options in the PEP was fair.[156] I see no basis to revisit that finding. But that is not the end of the fair price inquiry. The Court still must assess the fairness of what Defendants actually paid for their stock options. That is where Defendants' case falls short.

Defendants each were granted options valued at approximately $300,000. Yet they each paid less than $2,000 in cash (the par value) to exercise those options and then, in lieu of cash, made a promise to pay the substantial balance owed with interest as reflected in the Notes.[157] As discussed above, the Board forgave those Notes long

---

[156] JX 57 (Summary Judgment Bench Ruling), at 9–10.

[157] Plaintiff takes issue with the interest rates set for the Notes stating that they "bore the absolute minimum interest required to avoid having the IRS impute income." Pl.'s Post-Trial Opening Br. 51. Had the options otherwise been properly granted as incentive compensation, that interest rate selection would not be problematic.

before the principal balance was even touched.[158] Under these circumstances, the fair price analysis must turn on the fairness of Defendants' collective decision (as a Board) to forgive the Notes as purported compensation for the Company's success in 2007.[159]

Defendants testified that their compensation was consistently below the industry average and that, in light of the Company's strong performance in 2007 (because of their hard work), they determined it was appropriate to forgive the Notes. They purportedly made this determination after once again employing their *ad hoc* comparable companies analysis. Aside from pointing to the positive revenue results of 2007 (which Plaintiff vigorously challenges), however, Defendants have failed to show why such significant compensation was justified, especially considering the Company-wide bonus that was awarded to each of the Defendants (along with the Company's other employees) less than three months prior. Here again, there was no attempt to document the specific efforts or initiatives undertaken by Defendants in 2007 that would justify the forgiveness of their substantial debt to the Company, no documented attempt to compare 2007 to past years as a means to justify the

---

[158] While Bassett ultimately chose not to have his Note forgiven, the Board had already forgiven the Note and would have done so again had Bassett so desired. Tr. 274:24–275:8 (Mark Winmill Testimony).

[159] Bassett is not considered for this part of the fair price analysis since his estate paid the entirety of his Note. Since all three Defendants were found to have facilitated an unfair process, however, this exclusion does not alter the finding of Bassett's liability.

extraordinary level of additional compensation paid only to Defendants and, of course, no expert analysis of the propriety of the Board's self-interested decision or its impact on the Company. In light of the very limited time Defendants spent working on behalf of Winmill & Co. during the relevant years, the compensation Defendants received from other Company affiliates and the lack of objective evidence supporting Defendants' claim of inadequate compensation, I cannot find that Defendants carried their burden of proving that the amount they paid for their stock options was fair.[160]

Finally, I am satisfied that the Board's failure to implement a fair process when granting the option awards and when deciding to forgive the Notes ultimately

---

[160] *See Valeant*, 921 A.2d at 748–49 ("The court's finding that ICN's management and board used an unfair process to authorize the bonuses does not end the court's inquiry because it is possible that the pricing terms were so fair as to render the transaction entirely fair. Nevertheless, where the pricing terms of a transaction that is the product of an unfair process cannot be justified by reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult. Relatedly, where an entire fairness review is required in such a case of pricing terms that, if negotiated and approved at arm's-length, would involve a broad exercise of discretion or judgment by the directors, common sense suggests that proof of fair price will generally require a showing that the terms of the transaction fit comfortably within the narrow range of that discretion, not at its outer boundaries."). On the fair price question, Defendants renew their argument that this case was never about compensation (or at least not compensation received from Winmill & Co. affiliates). *See, e.g.*, OA Tr. 68:5–70:10; 86:12–87:24. To analyze the fairness of the price paid for the options, however, I must assess Defendants' work for the Company, the work they performed elsewhere and the compensation they received from all sources.

"infect[ed] the fairness of the price."[161]  In addition to the process infirmities already discussed, it cannot be ignored that the Board remained focused on the personal interests of the individual beneficiaries of the option grants (themselves) throughout its decision making with respect to the PEP.  Recall, for example, that the Board initially forgave the Notes in February 2008 but then rescinded that decision when the debtors determined they were not prepared to deal with the tax consequences of loan forgiveness.  Once the tax issues were addressed, the Board caused Thomas and Mark's Notes to be forgiven again but honored Bassett's request to keep his Note in place.  When Bassett could not pay upon the Note's maturity, the Board extended the maturity of his payment obligation without consideration.  These decisions might make perfect sense if this "family business" was, actually, a "family business" where the members of the Winmill family were the only stakeholders.  But there were other stakeholders here, namely the public stockholders.  Defendants owed those stockholders fiduciary duties of care and loyalty; they could not make decisions just because those decisions suited their needs or interests.  By acting only out of self-

---

[161] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. 1999) ("[T]he unfairness of the process also infects the fairness of the price."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) ("[P]rocess can infect price.").

interest, Defendants have diminished any confidence that the price they actually paid

for their stock options was fair.[162]

---

[162] *See, e.g.*, *Bomarko*, 794 A.2d at 1183 (quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997)) (explaining that process and price can be "so intertwined" that even a finding that the price "might have been fair does not save the result").

## 2. The Remedy

Having found that Defendants breached their duty of loyalty, I turn next to the difficult question of what relief is appropriate to remedy the breach.[163] With regard to the Issuance Claim, Plaintiff requested in the Complaint that the Court award damages "in an amount to be determined at trial," cancel "the options and all shares acquired using the options" and award "such other further relief" as might be justified.[164] In the Pre-Trial Order and its pre-trial opening brief, Plaintiff requested "[r]escission of all of the challenged Stock issued to the Individual Defendants in 2005."[165] In its post-trial opening brief, Plaintiff again requested cancellation of the "options issued under the [] PEP," but additionally requested that the Court not return to Defendants the money they paid to exercise their options.[166]

At trial, Plaintiff failed to present any evidence in support of its prayers for relief. When the Court expressed its concern during closing arguments that the

---

[163] I note that Plaintiff did not try or argue a breach of the duty of care with respect to the Issuance Claim.

[164] Compl. ¶ 73. The unexercised options expired after five years. *See* JX 15 (May 23, 2015 Written Consent), at W-0005. As noted, due to the length of time that has passed since the initiation of the 2008 Action, the unexercised options had expired by the time of trial.

[165] PTO 10. Plaintiff also requested rescission of "all options issued to Defendants in connection with the PEP" in its pre-trial brief. Pl.'s Pre-Trial Br. 3.

[166] Pl.'s Post-Trial Opening Br. 60.

48

evidentiary foundation for Plaintiff's requested remedies was lacking, counsel appealed to the Court's sense of equity and urged the Court to employ its broad discretion in fashioning relief to remedy a loyalty breach.[167] Of course, Plaintiff is correct in asserting that this court has "significant discretion . . . in fashioning an appropriate remedy."[168] Indeed, "[i]n determining damages, the Court's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'"[169] And, in cases where the court has found a breach of the duty of loyalty, recovery is "not to be determined narrowly." [170] To be sure, in these

---

[167] *See* OA Tr. 41:17–42:5. *See also* Pl.'s Post-Trial Reply Br. 11 ("The suggestion that a court of equity could not fashion an appropriate remedy if it found a breach of fiduciary duty by self-dealing fiduciaries is one without precedent in Delaware."). When pressed at post-trial oral argument to point to evidence or offer guidance with respect to remedies, Plaintiff suggested that the Court could and should convene a separate hearing to address remedies. OA Tr. 42:1–42:5. With a decade of litigation under our collective belts, and ample opportunity for Plaintiff to develop and present its best evidence, I decline to hold additional evidentiary hearings in this case.

[168] *Bomarko*, 794 A.2d at 1184.

[169] *Id.* (quoting *Weinberger*, 457 A.2d at 714); *Zutrau v. Jansing*, 2014 WL 3772859, at *40 (Del. Ch. July 31, 2014) ("Among the factors a Court will consider in determining an appropriate remedy is whether there is evidence of 'fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching.'" (quoting *Weinberger*, 457 A.2d at 714)).

[170] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." (quoting *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993)). *See also Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) ("[T]he Court of Chancery has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty") (internal quotation omitted); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 776 A.2d 437, 440 (Del. 2000) ("[T]he powers of the Court of Chancery are very broad in

circumstances, "potentially harsher rules come into play."[171]  But the Court still must

have some basis in the evidence upon which to grant relief.[172]  After carefully

reviewing the record, I am satisfied that there is no legal or evidentiary basis to grant

a remedy to the Company beyond nominal damages.

### a. There is No Evidentiary Basis for Granting Compensatory Damages

As a general matter, I agree with Plaintiff that compensatory damages are an

appropriate means by which to remedy a breach of the duty of loyalty.[173]  Plaintiff,

however, presented absolutely no evidence upon which the Court could justify an

award of compensatory damages to the Company.[174]  Thus, any award of

---

fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages.").

[171] *Bomarko*, 794 A.2d at 1184.

[172] *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 541 (Del. 1996) ("While it is often thought to be axiomatic that a wrong must have a correlative remedy, this is not always the case."); *PharmAthene, Inc. v. SIGA Tech., Inc.*, 2011 WL 6392906, at *3 (Del. Ch. Dec. 16, 2011) ("[T]his Court enjoys remedial flexibility to depart from strict application of the ordinary forms of relief where circumstances require.  Nevertheless, courts of equity should attempt to balance that flexibility by a measure of concomitant restraint to minimize uncertainty."); *In re Fuqua Indus., Inc.*, 2005 WL 1138744, at *7 (Del. Ch. May 6, 2005) (even a court of equity should award damages only when they are "susceptible of proof and appropriate to all the issues of fairness").

[173] *See OptimisCorp v. Waite*, 2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009).

[174] In its post-trial opening brief, Plaintiff requested "expenses related to the 2005 PEP." *See* Pl.'s Post-Trial Opening Br. 60.  That remedy was not requested in the Complaint and, in any event, no evidence was presented with respect to that request at trial.  As Plaintiff's

compensatory damages would be the product of rank speculation and, as a matter of law, improper.[175]

### b. Neither Cancellation nor Equitable Rescission nor Rescissory Damages are Warranted

With respect to Plaintiff's request for cancellation of the shares, Defendants argue that (1) Plaintiff provided no basis for cancellation without the return of both Plaintiff *and* Defendants to the status quo[176]; and (2) the Pre-Trial Order should govern and Plaintiff requested rescission in the Pre-Trial Order, not cancellation.[177] To the extent the Court considers rescission, Defendants point out that this remedy would harm rather than help the Company since the Company cannot afford to repay Defendants the amounts they paid for their options.[178] Once again, Plaintiff offered little by way of guidance in response to this argument.[179]

---

counsel acknowledged during closing arguments, "this court has always fashioned remedies *based on the evidence presented at trial* and the [c]ourt's conclusions." OA Tr. 102:13–15. Without evidence presented at trial, I cannot award Plaintiff's requested compensatory damages.

[175] *OptimisCorp*, 2015 WL 5147038, at *82 (holding that the court cannot award speculative damages); *Ivize of Milwaukee, LLC v. Compex Litig. Supp., LLC*, 2009 WL 1111179, at *11 (Del. Ch. Apr. 27, 2009) (same); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 12 (Del. Ch. 1992) (same); *Twardowski v. Jester*, 163 A.2d 242, 224 (Del. Ch. 1960) (same).

[176] OA Tr. 98:22–99:8; Defs.' Post-Trial Answering Br. 57.

[177] PTO 10.

[178] Defs.' Post-Trial Answering Br. 57–59.

[179] OA Tr. 102:10–15.

Based on the record presented, I agree with Defendants that (1) Plaintiff has not presented a basis for cancellation without a mutual return to the status quo; (2) equitable rescission would not be in the Company's best interest under the unique circumstances presented here[180]; and (3) Plaintiff has failed to present evidence upon which I could fashion an award of rescissory damages.[181] I explain each of these findings below.

To start, it is important to understand what the terms "cancellation" and "rescission" mean under Delaware law. Rescission can be sought at law or in

---

[180] I acknowledge that the remedy question, with regard to rescission, presents a rather unique issue due to the derivative nature of this action. Generally, plaintiffs do not request relief that will not provide a benefit to them. In derivative actions, however, the plaintiff ostensibly seeks a remedy for the company but may not have the same ability or incentives to ensure that what he is asking for will actually provide a net benefit to the real party in interest. This dynamic apparently is at work here. The Court's focus, nevertheless, must remain on fashioning a remedy that is supported in law, in the evidence and in the practical realities confronting the Company. *See Great Hill Equity P'rs IV, L.P. v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 n.274 (Del. Ch. Nov. 26, 2014) ("Rescission is a remedy available only where facts indicate equity so requires." (quoting *ENI Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013)); *Sunbelt*, 2010 WL 26539, at *14 ("[R]escission is an equitable remedy that a court of equity will only grant, as an exercise of discretion, when that remedy is clearly warranted."); *Keenan v. Eshleman*, 2 A.2d 904, 912 (Del. 1938) (explaining that the proper remedy in a derivative action must be determined by preserving "the fiction of corporate entity" and that the action must be "considered as though the corporation itself were suing the defendants"); 12A C.J.S. *Cancellation of Inst.* § 11 (2018) ("Where the cancellation of an instrument is sought but it appears that such decree would in no way help the party seeking it, the court will not perform the vain act of decreeing the cancellation.").

[181] *See Oliver*, 2006 WL 1064169, at *25.

equity.[182]  By ordering rescission, whether at law or in equity, the court endeavors

to unwind the transaction and thereby restore *both* parties to the *status quo*.[183]  While

rescission at law refers to the "judicial declaration that a contract is invalid and a

judicial award of money or property,"[184] equitable rescission offers a platform to

provide additional equitable relief, such as cancellation of a valid instrument—the

formal annulment or setting aside of an instrument or obligation.[185]  In this form,

---

[182] *Schlosser & Dennis, LLC v. Traders Alley, LLC*, 2017 WL 2894845, at *9 (Del. Super. July 6, 2017); *E.I. du Pont de Nemours & Co. v. HEM Research, Inc.*, 1989 WL 122053, at *3 (Del. Ch. Oct. 13, 1989); 12A C.J.S. *Cancellation of Instr.* § 2 (2018).

[183] *Hegart v. Am. Commonwealths Power Corp.*, 163 A. 616, 619 (Del. Ch. 1932) ("[I]t is fundamental that if the choice be made of rescission, there must be a restoration of the status quo ante, not only of the complainant but as well of the defendant. It is therefore necessary that the rescinding party should offer or tender such a restoration to the other, and that the court should be able to effectuate it by decree.").  *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Nov. 1, 1984) ("It is settled law that if a plaintiff chooses the remedy of rescission, there must be a restoration of the status quo ante, not only of the plaintiff but of the defendant as well, and if under the facts of the particular case 'a just and equitable restoration of the substantial status quo ante' cannot be accomplished, rescission will be denied.").

[184] *E.I. du Pont*, 1989 WL 122053, at *3.

[185] *Id.* ("This additional aspect, the "equitable" ingredient in rescission, is necessitated, for example, in circumstances in which if an instrument, document, obligation, or other matter were not cancelled, plaintiff would be exposed to liability to third parties not appearing in the action. If plaintiff is fraudulently induced to execute a note in favor of defendant, the only remedy that is adequate for plaintiff is cancellation of the note to ensure that defendant does not transfer the note to a bona fide purchaser, who could then recover from plaintiff under the note.").  *See also MBKS Co. Ltd. v. Reddy*, 924 A.2d 965, 976 (Del. Ch. 2007) (finding cancellation of stock appropriate and ordering the return of "all monies paid by [the stockholder] for th[e] shares").

equitable rescission is often referred to as cancellation,[186] although it is generally accompanied by further relief (such as restitution)[187] in order to achieve a complete restoration to the *status quo ante*.[188]

In its Complaint and post-trial briefing, Plaintiff clearly requested cancellation of the shares.[189] It has not presented, however, a basis in law or the trial evidence to warrant cancellation of the shares without a corresponding requirement that the

---

[186] *E.I. du Pont*, 1989 WL 122053, at \*3; Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04[a], at 12-58 (2017) ("[R]escission refers to the avoidance of a transaction or the cancellation of the deal.")

[187] Restitution is "the return of that which one or both parties gained through an avoided transaction to prevent unjust enrichment." Wolfe & Pittenger, *supra*, § 12.04[a], at 12-58.

[188] Wolfe & Pittenger, *supra*, § 12.04[a], at 12-58 ("As a remedy, rescission seeks to 'unmake' an agreement; it 'calls the deal off' and seeks to return the parties to the status quo ante. Rescission is, therefore, less a remedy and more a matter of conceptual apparatus that leads to the remedy; because the contract is being unmade, the exchange of consideration has to be reversed, and if it is not possible to restore such consideration in kind, the plaintiff may be entitled to the monetary equivalent of what he gave up in damages."); *E.I. du Pont*, 1989 WL 122053, at \*3; 12A C.J.S. *Cancellation of Inst.* § 2 (2018) ("Generally, cancellation or rescission of a written instrument are one and the same remedy . . . The terms 'cancellation' and 'rescission' are frequently regarded as being interchangeable or synonymous. . . . If there is a distinction between cancellation and rescission, it is only that 'rescission' is the general undoing of the original agreement while 'cancellation' is a more formal annulment or rendering of an instrument ineffective as a legal obligation. Thus, while rescission and cancellation usually go together, still, insofar as the physical cancellation of a written instrument is concerned, they are not inseparable. Although a decree for rescission alone might amount to a judicial annulment of the contract, whether oral or written, in its strictest sense, cancellation can ordinarily apply only to written instruments.").

[189] Compl. ¶ 47; Pl.'s Post-Trial Opening Br. 2–3, 60.

Company return to Defendants the funds they expended to exercise their options. Generally, cancellation without restitution is only warranted where there has been a total failure of consideration (including as a result of fraud).[190] The court has, however, denied cancellation without restitution even in cases of fraud and misrepresentation where there has been *some* exchange of consideration.[191] Here, Defendants' exercise of the stock options is supported by some consideration (the payment of par value and some interest) and Plaintiff has not alleged, much less proven, any fraudulent conduct on Defendants' part. Because I have determined that there is no support for "pure" cancellation, I need not—and do not—address Defendants' argument that Plaintiff waived any right to cancellation by not requesting it in the Pre-Trial Order.

That leaves the question of whether Plaintiff is entitled to cancellation of the shares accompanied by a return of the funds to Defendants—an award of true

---

[190] *See, e.g.*, *Diamond State Brewery v. De La Rigaudiere*, 17 A.2d 313, 318 (Del. Ch. 1941) (finding cancellation proper where the facts indicated gross overvaluation and fraudulent concealment of a total failure of consideration). *Blair v. F. H. Smith Co.*, 156 A. 207, 213 (Del. Ch. 1931) (granting cancellation without restitution after finding that "not a particle of consideration was given"); *Gillette v. Oberholtzer*, 264 P. 229, 230 (Idaho 1928) (referring to "the general requirement that a grantor procuring the cancellation of an instrument, even for duress or fraud, must place the grantee in statu[s] quo, a rule so elementary as to require no citation of authority"); *Rogers v. Hale*, 218 N.W. 264, 266 (Iowa 1928) (finding that even where fraud was proven, rescission had to accompany cancellation).

[191] *Cf. Craft*, 1984 WL 8207, at *11–12 (denying equitable rescission of fraudulently procured transaction where the transaction was supported by consideration).

equitable rescission. There is no question that equitable rescission is generally an effective remedy for a breach of the duty of loyalty.[192] Even so, "a court of equity will only grant rescission, as an exercise of discretion, when that remedy is clearly warranted."[193] The remedy is not warranted here for the simple reason that the Court cannot "restore the parties substantially to the position which they occupied before" the option grants were made.[194]

As discussed, the restoration of the *status quo* would require the cancellation of the stock as well as the Company's return to Defendants of the funds they paid to exercise the stock options. While Defendants' stock is voidable and could, therefore, be cancelled,[195] the Company's return of the funds Defendants paid for their options

---

[192] *Schlosser*, 2017 WL 2894845, at *10; *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014) ("The remedy is available for an adjudicated breach of the duty of loyalty, such as cases involving self-dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary.").

[193] *Sunbelt*, 2010 WL 26539, at *14. *See also Zutrau*, 2014 WL 3772859, at *40 (declining to grant rescission because it was not shown that the self-interested transaction was completed with "conscious intent to deprive [] of the fair value of [] shares, or deny [] access to benefits of pending corporate opportunities"); *Diamond State Brewery*, 17 A.2d at 318 (When stock is not void but "merely voidable, then that form of relief is to be adopted which would seem to be most in accord with all the equities of the case. I find nothing in the position of respondents which would justify allowing them to retain the [] stock.") (internal quotation omitted).

[194] *Craft*, 1984 WL 8207, at *12. *See also id.* ("[I]f under the facts of the particular case a just and equitable restoration of the substantial status quo ante cannot be accomplished, rescission will be denied.").

[195] Here, the stock is voidable rather than void because "[t]here is nothing in the record [] suggesting that the action of the Board of Directors [], in [granting] the stock option[s], was actually fraudulent or of such illegality as to be absolutely void. The interested

56

would significantly reduce (if not completely eliminate) the Company's available cash resources.[196] Under these circumstances, because rescission would afford no benefit to the Company, the Court cannot conclude that the remedy is "warranted."[197]

For the same reasons rescission is not warranted, rescissory damages, "the monetary equivalent of rescission,"[198] are also inappropriate. To start, Plaintiff did not request rescissory damages.[199] Regardless, that remedy is only available in cases where rescission is warranted but not feasible.[200] Here, because rescission is not warranted, rescissory damages also are not warranted.

---

character of the directors who voted for the [grant, however,] makes their action voidable." *Kerbs v. Ca. E. Airways*, 90 A.2d 652, 655 (Del. 1952). Voidable stock is subject to cancellation as a matter of equity. *See STAAR*, 588 A.2d at 1137 (citing *Diamond State Brewery*, 17 A.2d at 318).

[196] Defendants presented credible testimony that equitable rescission would not be in the best interest of the Company. Tr. 146:15–150:7 (Thomas Winmill Testimony). The Company would have to return the par value, interest and (for Bassett) the Note principal paid in full. In exchange, the Company would be receiving stock worth substantially less now than it was in 2006 or 2007. Tr. 23:7–11 (Thomas Winmill Testimony). Thus, rescission would result in a windfall for Defendants rather than a benefit to the Company.

[197] *Sunbelt*, 2010 WL 26539, at *14.

[198] *Orchard*, 88 A.3d at 38 (internal citation omitted).

[199] Compl. ¶¶ 69, 74; PTO 10.

[200] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 855 A.2d 1059, 1072 (Del. Ch. 2003) ("Because rescission was practicable, I—as the Supreme Court found—denied that remedy as unwarranted. Because rescission was found to be unwarranted, an award of rescissory damages was also unwarranted. The reason that is so is simple. Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable. A solid body of case law so holds."); *Catamaran Acq. Corp. v. Spherion Corp.*, 2001 WL 755387, at *4 (Del. Super. Ct. May 31, 2001) ("Rescissory damages may be appropriate when the equitable remedy of rescission is

Assuming, *arguendo*, that rescission were warranted (but somehow not feasible), rescissory damages would still not be an available remedy because there is no adequate basis on which to calculate them.

> In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property, the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property. In a case involving corporate stock, rescissory damages can be measured at the time of judgment, the time of resale, or at an intervening point when the stock had a higher value and remained in control of the disloyal fiduciary.[201]

When awarding rescissory damages, "[t]he law does not require certainty in the award" but allows, instead, "[r]easonable estimates that lack mathematical certainty . . . so long as the court has a basis to make a responsible estimate of damages."[202] But even rescissory damages "may only be considered if they are susceptible of proof and appropriate to all the issues of fairness."[203]

---

impractical" but otherwise warranted.") (internal quotation omitted); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. 1994) (holding that rescissory damages are "applied when equitable rescission of a transaction would be appropriate, but is not feasible."); *Weinberger*, 1984 WL 478433, at *5 (same).

[201] *Orchard*, 88 A.3d at 38–39 (internal citation omitted).

[202] *Reis*, 28 A.3d at 466.

[203] *In re Fuqua*, 2005 WL 1138744, at *7 (internal quotation omitted). *See also Weinberger v. UOP, Inc.*, 1985 WL 11546, at *2–3 (Del. Ch. Jan. 30, 1985) (finding rescissory damages "inappropriate as a remedy because of the speculative nature of the offered proof").

The problem here is that Plaintiff again has provided no evidentiary basis for even a "responsible estimate" of rescissory damages.[204] The trial evidence suggests that the current value of Winmill & Co. stock (approximately $1 per share) is eclipsed by the sum(s) Defendants have already paid to the Company (in the form of par value and interest payments). A grant of rescissory damages based on this share value, given the need to award appropriate offsets to Defendants for amounts paid for their options, would cause a net loss for the Company.

There is evidence in the record that the trading price of the Stock at the time the stock options were granted was $2.68 per share.[205] That marker might provide a basis upon which to formulate a principled rescissory damages award (*e.g.*, by awarding the difference between the "the highest intervening [per share] value" of the Stock since the time of the wrong and the current value of the Stock) if the Court could conclude that the Company "could have disposed of [the stock] at the higher intervening price."[206] But there is no evidence in the record that would support the

---

[204] *In re MAXXAM, Inc.*, 659 A.2d 760, 775–76 (Del. Ch. 1995) (explaining that calculating rescissory damages requires evidence of the present value of the assets (as of the time of judgment) and that the evidence presented was insufficient to determine that value); *Weinberger*, 1985 WL 11546, at *7 ("I find rescissory damages to be inappropriate as a remedy because of the speculative nature of the offered proof.").

[205] JX 58 (Stock Price Chart May 23–June 30, 2005).

[206] *Reis*, 28 A.3d at 467–68 ("[R]escissory damages . . . [may] reflect . . . the highest intervening value [of wrongfully taken corporate stock] between the time of the wrong and

conclusion that the Company "could have disposed of" 199,998 shares of Stock at $2.68 per share at any time between May 23, 2005 and now. Consequently, any award of rescissory damages based on that marker would be unduly speculative and, thus, inappropriate.[207]

That leaves the Court to its own imagination as to what remedy to award. One could imagine a scenario where Bassett's estate (having paid the entirety of Bassett's Note principal) keeps its stock and rescission is ordered as to Thomas and Mark only. This scenario might eliminate the "net loss" problem in that the value of the shares would exceed the amount due back to Thomas and Mark. But there are still too many unknowns with regard to a rescission remedy that targets only the Winmill brothers. Are the Company's current cash resources sufficient to pay Thomas and Mark their expended funds? Even if the Company has sufficient funds, would it benefit the Company to receive back shares that are worth significantly less now

---

the time of judgment if the beneficiary or a faithful fiduciary could have disposed of wrongfully taken [stock] at the higher intervening price.") (citations omitted).

[207] *See Gaffin v. Teledyne, Inc.*, 1990 WL 195914, at *16–17 (Del. Ch. Dec. 4, 1990) (declining to award rescissory damages when plaintiff's expert testimony and plaintiff's remaining evidence were "speculative and not persuasive"), *aff'd in part, rev'd in part on other grounds*, 611 A.2d 467 (Del. 1992); *Weinberger*, 1985 WL 11546, at *7 ("I find rescissory damages to be inappropriate as a remedy because of the speculative nature of the offered proof."). That same exhibit also shows values of up to $2.85 per share on several dates in June 2005. JX 58 (Stock Price Chart May 23–June 30, 2005). Those values fail as markers for the same reason as the price on the day of grant.

than when the share options were granted? Again, Plaintiff has not presented evidence or argument in support of this approach and I have no basis to know whether the approach offers any remedy at all to the Company.[208]

In attempting to fill the gap left by Plaintiff's failure to plead, prove or argue for appropriate remedies, the Court has also considered the possibility of ordering specific performance of the promissory notes given by Thomas and Mark that were forgiven by the Board.[209] Plaintiff did not ask for specific performance in any of its pleadings. Nevertheless, as a general matter, a prayer within a complaint for "such other further relief as justified," such as the one included in the Complaint, could encompass, in an appropriate case, an award of specific performance.[210] But this is not that case. Not only did Plaintiff not seek specific performance in any of its complaints, it did not do so in the Pre-Trial Order, in its Pre-Trial Brief, at trial, in

---

[208] *Weinberger*, 1985 WL 11546, at *2 (declining a form of damages based on its speculative nature).

[209] Specific performance as to Bassett is unnecessary since he (and his estate) paid the Note principal.

[210] Compl. 33. *See, e.g. Int'l Union of Elevator Constructors, AFL-CIO v. Reg'l Elevator Co.*, 847 F. Supp. 2d 691, 701 (D. Del. 2012) ("Because Plaintiffs' Complaint did request that the Court grant other such relief deemed just and proper, Plaintiffs' claim for specific performance is appropriately raised.") (internal quotation omitted); *Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231, 248–49 (3d Cir. 1999) ("In its amended complaint, the Union requested money damages representing lost wages and fringe benefits, a declaratory judgment, and such other relief as the Court deems just and reasonable . . . As a result, we believe that the request for relief in the amended complaint is broad enough to encompass a request for specific performance, especially in light of the actual request made in a post-trial brief.") (internal quotation omitted).

its Post-Trial Briefs or during Post-Trial argument.[211]  Indeed, Plaintiff sought the opposite of specific performance; it sought rescission or cancellation of the option grants (without any assessment, apparently, of whether that remedy would actually benefit the Company).[212]

"The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it."[213] Plaintiff's basic failure meaningfully to address the remedy question at any stage of these proceedings has created a vacuum that the Court cannot fill, even in the spirit of equity, without offending fundamental notions of due process.  This case has been pending for almost ten years.  Both sides have had more than ample opportunity to formulate their positions, develop supporting evidence and make their case at trial. Under these circumstances, it is not appropriate to re-open the trial record to allow Plaintiff to do what it should have done in the first place.

---

[211] *Cf. Sheet Metal Workers*, 201 F.3d at 248–29 (court found specific performance available when complaint included reference to "such other relief as the Court deems just and reasonable" *and* Plaintiff requested the relief after trial thereby affording defendant the opportunity to respond); *Int'l Union of Elevator Constructors*, 847 F.Supp. 2d at 701 (same).

[212] Compl. ¶ 74 (requesting cancellation); PTO 10 (requesting rescission); Pl.'s Pre-Trial Br. 43 (requesting rescission); Pl.'s Post-Trial Opening Br. 60 (requesting cancellation).

[213] *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976).  *See also Watson v. Div. of Family Servs.*, 813 A.2d 1101, 1107 (Del. 2002) ("[T]his Court's construction of the Delaware Constitution's mandate for due process . . . has been consistent with the flexible standards of due process enunciated by the United States Supreme Court in *Mathews v. Eldridge*.").

### c. An Award of Nominal Damages is Appropriate

Since I have found a breach of the duty of loyalty but am unable to award any other form of relief, I find that Plaintiff is entitled to nominal damages.[214]

> Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a[n] [] injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.[215]

In recognition that these Defendants acted disloyally to the Company, I grant nominal damages in the amount of $1.[216]

### B. The Financial Reporting Claim

As previously noted, Plaintiff's Financial Reporting Claim derived from a combined Section 220 and breach of fiduciary duty action.[217] By the time of trial,

---

[214] *Ivize*, 2009 WL 1111179, at \*12; *Oliver*, 2006 WL 1064169, at \*25 ("Therefore, although the BU Defendants did breach their duty of loyalty and were unable to demonstrate the entire fairness of the Series B and C transactions, for purposes of assessing the fiduciaries' treatment of these claims in the context of negotiating the Accord Agreement, the Court does not find it appropriate to assign anything but nominal damages to these breaches.").

[215] *Oliver*, 2006 WL 1064169, at \*34 (quoting *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at \*15 (Del. Ch. Dec. 15, 2005)).

[216] *Ivize*, 2009 WL 1111179, at \*12 ("[T]he court holds that Ivize is entitled to nominal damages in the amount of one dollar."); *Oliver*, 2006 WL 1064169, at \*34–35 ("[F]or the purpose of declaring an infraction of the Plaintiffs' rights and the commission of a wrong, the Court awards the Plaintiffs, and the prevailing class they represent, one dollar in nominal damages.") (internal citation omitted).

[217] By way of reminder, the Section 220 claim and the Financial Reporting Claim were severed early on in that case. JX 51 (*Ravenswood III*), at 3–4.

the Section 220 claim had been decided and prior rulings of the Court had significantly narrowed the breach of fiduciary duty claim.[218] The only aspect of the initial claim that survived Defendants' motion practice was whether Defendants stopped "the preparation of [the] audited financial reports and perhaps other financial information" because of "a troublesome shareholder's use of its Section 220 rights."[219]

In post-trial briefing and during closing arguments, Plaintiff attempted to revive claims based on a general obligation to disclose information to stockholders.[220] Those claims no longer are part of the Financial Reporting Claim, assuming they ever were viable.[221] With regard to the claim that was tried, the gravamen of Plaintiff's argument is that Defendants' decision to stop the Company's preparation of financial statements, in the form prepared for years, constitutes a breach of their fiduciary duty of loyalty because Defendants made that decision in

---

[218] *Id.* at 10.

[219] *Id. See also* JX 57 (Summary Judgment Bench Ruling), at 21.

[220] *See, e.g.*, Pl.'s Post-Trial Reply Br. 12–13 (explaining that stockholders have no way of receiving financial information and that footnotes to financial statements are important for stockholder understanding of Company financials); OA Tr. 37:7–38:22 (arguing that the Defendants have not run the Company for the benefit of the stockholders and that it could have provided financials and corresponding footnotes without an audit).

[221] JX 51 (*Ravenswood III*), at 10. *See also* JX 57 (Summary Judgment Bench Ruling), at 21.

64

order to punish Plaintiff for exercising its inspection rights under 8 *Del. C.* § 220. Defendants argue that Plaintiff failed to present any evidence to support its claim of vindictive motive or to counter their explanation that the Company chose not to continue preparing financial statements because of cost, time commitment, lack of necessity and risks of meritless litigation.

Our law presumes that the directors of Delaware corporations make business decisions on an informed basis and in the honest belief their decision is in the corporation's best interest.[222] To overcome this presumption, as Plaintiff seeks to do here, Plaintiff bears the burden of proving that the Defendant directors "appeared on both sides of the transaction or derived a personal benefit from a transaction in the sense of self-dealing."[223] No such proof exists in the trial record with respect to the Financial Reporting Claim.[224]

The evidence at trial showed that the Company's last financial audit was completed in October 2012.[225] Around that same time, the parties were involved in motion practice in Plaintiff's Section 220 Action. Plaintiff argues it was that

---

[222] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360–61 (Del. 1993); *Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003).

[223] *Zoren*, 836 A.2d at 528; *Cede*, 634 A.2d at 361.

[224] *See Cede*, 634 A.2d at 361.

[225] JX 46 (Winmill & Co. 2011 Annual Report), at WFIN-0066.

litigation that prompted Defendants' decision to stop the Company's preparation of financial statements. As support, Plaintiff points to evidence that the Court heard oral argument on Plaintiff's motion to compel and for sanctions in the Section 220 Action the day after the last audit report was issued.[226] It then points to testimony of Thomas and Mark indicating that one reason for their decision to stop the Company's preparation of financial statements was the anticipation of further litigation.[227]

Plaintiff's circumstantial evidence of temporal connection is insufficient to reveal the kind of improper motive or self-interested decision making that would justify a finding that the business judgment presumption does not apply here. First, the 2012 hearing to which Plaintiff refers concerned, *inter alia*, a motion to compel the attendance of one of the Defendants at a deposition as a Company witness.[228]

---

[226] Tr. 239:2–13 (Thomas Winmill Testimony). *See* JX 46 (Winmill & Co. 2011 Annual Report); D.I. 59 (C.A. No. 7048-VCS); *see also Ravenswood II*, 2013 WL 396178. Plaintiff also argued, in its pre-trial briefing, that the parties were involved in ongoing disputes over confidentiality agreements in the Section 220 Action. Pl.'s Pre-Trial Br. 44. Plaintiff did not mention this argument in its post-trial briefing. *See* Pl.'s Post-Trial Opening Br. 54–59; Pl.'s Post-Trial Reply Br. 12–14.

[227] JX 4 (Mark Winmill Deposition) at 45:10–46:11; 48:24–51:21. Mark testified that the Delaware litigation was not the cause but that it was, instead, the "general feeling about the avoidance of expensive litigation." Tr. 50:3–13. (Thomas Winmill Testimony)

[228] *Ravenswood II*, 2013 WL 396178, at *1.

66

That motion was resolved, in January 2013, in *Defendants' favor*, when the Court held that Defendants could pick their Company witness.[229]

Second, the testimony upon which Plaintiff relies likewise does not reveal any desire to punish Plaintiff for its Section 220 Action. Both Thomas and Mark testified that the decision to discontinue the Company's preparation of audited financial statements was made to save the Company time and money and reduce the risk of disclosure-related litigation (which is also costly and time consuming) without any commensurate benefit to the Company. They also credibly explained that the timing corresponded with the passing of their father who had insisted on continuing the practice of preparing audited financials and disseminating them to stockholders after 2004 (when the Company deregistered and delisted from NASDAQ). I am satisfied that Defendants decided to discontinue auditing and disseminating financial information based on valid business considerations rather than to punish Plaintiff for its Section 220 Action.[230] Having failed to rebut the business judgment presumption, Plaintiff's Financial Reporting Claim fails.

---

[229] *Id.* at *2 ("at least for purposes of initial discovery, the corporate officer selected by Winmill should suffice").

[230] There is no evidence that the Board failed to provide information to stockholders when seeking stockholder approval of Board decisions or that the Board was presented with other circumstances where it was legally obligated to provide information to stockholders (under the Delaware General Corporation Law or otherwise) but refused to do so.

## III.   CONCLUSION

For the foregoing reasons, judgment will be entered for Plaintiff on the Issuance Claim (Count II of the 2008 Action) and nominal damages in the amount of one dollar per Defendant are awarded to the Company.  Judgment will be entered for Defendants on the Financial Reporting Claim (the only remaining claim from the Section 220 Action).

I acknowledge that Plaintiff has requested attorneys' fees and expenses.[231] That request has not yet been addressed by the parties and will, therefore, be taken up separately.  The parties shall confer and submit a proposed schedule for prompt presentation of the request for fees.  The Court will enter its final order and judgment following resolution of the attorneys' fee issue.

---

[231] Compl. 33 (Prayer for Relief).